No. 46,296

John G. Winsor and Mabel I. Molzen, Co-Executors of the Estate of Wilbur M. Winsor, deceased, *Appellees*, v. Sarah E. Powell, *Appellant*, and John G. Winsor and Mabel I. Molzen, Co-Executors of the Estate of Wilbur M. Winsor, deceased, *Cross-Appellants*, v. Leslie A. Powell and Sarah E. Powell, *Cross-Appellees*.

(497 P. 2d 292)

Opinion filed May 6, 1972.

*Emmet A. Blaes,* of the firm of Jochems, Sargent & Blaes, of Wichita, argued the cause, and *Edwin G. Westerhaus,* of the firm of Wheeler, Westerhaus & Wheeler, of Marion, was with him on the brief for the appellant and cross-appellees.

*Thomas A. Wood,* of Wichita, argued the cause, and *Roger H. Morse,* of the firm of Morse & Batt, of Marion, was with him on the brief for the appellees and cross-appellants.

The opinion of the court was delivered by

FONTRON, J.: This is a consolidated appeal from judgments entered in two lawsuits, both of which stem from controversies arising between members of the family of the decedent, Wilbur M. Winsor, often referred to herein as Wilbur. The executors named in the will of Mr. Winsor, being two of his six children, instituted both actions, one against the testator's daughter, Sarah E. Powell, the other against Sarah and her husband, Leslie A. Powell. Both actions involve rights in personal property titled either in the names of Wilbur and Sarah as joint tenants, or Wilbur and Leslie as joint tenants.

The cases were tried jointly to the court, which, after an extensive hearing, entered judgment in favor of the executors against Mrs. Powell, or Sarah, in the one case and in favor of Leslie and Sarah in the other. The losers in each case were dissatisfied and, accordingly, Sarah appealed from the judgment entered against her while the executors appealed from the judgment against them in their case against Leslie and Sarah.

Wilbur Winsor was a long time farmer and rancher of this state who amassed considerable wealth during his lifetime. In 1899 he was married to Bird Winsor who died April 12, 1955, at which time Wilbur was 79 years of age. Six children were born to that union,

three sons, Glenn, Orville, and John and three daughters, Gretchen Runyon, Sarah Powell, and Mabel Molzen.

The monastic life was not long for Wilbur and on October 9, 1955, he took unto himself a second wife, Ella. This happy event brought little joy to the Winsor children and a certain coolness developed toward Ella on their part, although relations grew some-what more normal later on.

On April 9, 1967, Wilbur died testate and two of his children, John Winsor and Mabel Molzen, were appointed executors of his estate. At Wilbur's death Sarah's brothers and sisters discovered that Wilbur's stock in the Marion National Bank was held in joint tenancy with his son-in-law, Leslie, and all the rest of his personal property including bank accounts, savings and loan accounts, mutual fund shares and even the Kansas title to a 1962 Chevrolet car was held in the names of Wilbur and his daughter, Sarah, as joint tenants with right of survivorship. When this intelligence came to light, great was the consternation in the Winsor family and within a few months the present actions were commenced.

The petition filed against Sarah alleges that a close personal confidential relationship existed between Wilbur and Sarah at all material times; that on March 14, 1963, Sarah received a power of attorney from Wilbur and thereafter managed her father's property as a fiduciary; that Sarah furnished no consideration for any of the personal property held by Wilbur and herself as joint tenants; that Wilbur did not intend to make a gift of the property to Sarah but that the property was transferred and conveyed to Sarah as trustee to be held in trust for the benefit of Wilbur's heirs and the beneficiaries under his will; that any gift or transfer was obtained by undue influence; that Sarah was estopped to claim title to the property; and that Wilbur was incompetent when he transferred the property to Sarah and himself in joint tenancy. The prayer of the petition asked that Mr. Winsor's estate be declared the sole owner of said personal property; that Sarah be declared to hold the property in trust for the estate; that she be required to deliver the property to the executors of the estate and to account for the income therefrom.

In a memorandum decision the trial court entered general find-ings of fact followed by certain conclusions in which the following were included:

"1. The court finds that the contracts which on their face purport to create a 'joint tenancy' between Wilbur M. Winsor and Sarah E. Powell did in fact create a trust for the benefit of all the children of Wilbur M. Winsor.

"2. The court finds that the intention of Wilbur M. Winsor at the time of the creation of the contracts was for the purpose stated in conclusion No. 1 above.

"8. The court finds that the intention of the parties or party to the contract is paramount, and the 'joint tenancy phrase' must be considered in the light of all the evidence. The mere words when attacked cannot be self-supporting.

"9. The court finds that Wilbur M. Winsor did not, by the execution of any of the contracts to Sarah E. Powell, intend an inter vivos gift.

"11. The court cannot accept plaintiffs' theory of undue influence accruing to the benefit of the defendant Sarah E. Powell alone. The court finds undue influence was exerted prior to the contracts by Sarah E. Powell for the benefit of all the children and to the detriment of Wilbur M. Winsor's second wife, Ella Rutherford Winsor.

"12. The court finds that Wilbur M. Winsor was not mentally incapacitated at any time pertinent to this decision."

The following order was entered in the case against Sarah:

"The court finds for the plaintiff against the defendant Sarah E. Powell in Case No. 13,914, and orders that the defendant assign, transfer, and deliver the property in question to the plaintiffs herein, and that at said time the defendant be required to file an accounting as to all income, proceeds, and accretions therefrom."

To avoid confusion we shall discuss the appeal in each case separately and will first turn our attention to Sarah's appeal from the judgment which was entered against her. In doing so we will refer to Sarah either by name or as defendant.

Sarah phrases her first point on appeal in this fashion:

"The court erred in purporting to exercise jurisdiction to enter a judgment on issues not raised in either the pleadings or the pretrial order."

Her argument is that the plaintiffs predicated their action on the theory of a trust for the benefit of Wilbur's estate while the court found it was for the benefit of Wilbur's children.

The point is not well taken. The petition filed against Sarah alleges in paragraph nine that any property transferred to Sarah was transferred to her as trustee only, to be held in trust for the heirs of Wilbur M. Winsor and the beneficiaries under his will. The beneficiaries under Wilbur's will were the six Winsor children. The petition clearly raises the issue of a trust for Wilbur's children.

Moreover, the plaintiffs requested a finding of fact that Wilbur's intent in transferring his property in joint tenancy to himself and Sarah was to enable Sarah to manage the property during his

lifetime and, on his death, to divide the same among his six children and his widow. Again, in the trial brief furnished the court, the plaintiffs contended that the transfer was in trust for the benefit of the beneficiaries under Wilbur's will.

It is true that in its pretrial order defining the issues to be determined, the trial court referred to the alleged trust as being for the benefit of the estate of Wilbur M. Winsor.

We take note of the discrepancy but do not regard it as being significant. The ultimate and central issue for determination was whether Sarah held the property impressed with a trust. That was clearly indicated in both the petition and the pretrial order, as well as in the proceedings during trial. Sarah could not well have labored under any misapprehension as to the plaintiffs' contention that the property she held was impressed with a trust which would redound to the general benefit of Wilbur's children, who were the named beneficiaries in the will. This issue runs throughout the entire case and was tried with a vengeance on both sides of the table. In *Thompson v. Aetna Life Ins. Co.*, 201 Kan. 296, 440 P. 2d 548, this court held that where the parties have submitted their case on all the issues, they are held to have consented that such issues be decided notwithstanding that an issue so decided may technically have been outside the literal scope of the pretrial order. See, also, Gard, Kansas Code of Civil Procedure, § 60-215 (*b*), pp. 82, 83.

The defendant next assails the trial court's power to enter judgment purporting to create a trust which by its terms, so it is said, would have been a fraud upon Wilbur's widow, Ella. In this connection, the defendant argues that the trust completely ignores the rights of the widow and deprives her of any inheritance. We have some difficulty in understanding the rationale of this argument; Wilbur had the right, as held by this court in prior decisions, to dispose of his personal property during his lifetime as he might see fit, without regard to his wife. (See *Small v. Small*, 56 Kan. 1, 16, 42 Pac. 323; *Ackers v. First National Bank of Topeka*, 192 Kan. 319, 328, 387 P. 2d 840.)

But even if it be assumed that the conveyances to Sarah were motivated by a design to place the property beyond Ella's reach, and the record might well support such a postulate, she is not before us complaining of any fraud which may have been perpetrated upon her or upon her rights. The record reveals that about

the time the instant action was filed, Ella filed suit against both Sarah and the executors of Wilbur's estate for the purpose of requiring Sarah to deliver to the executors one-half the property Sarah held in joint tenancy with Wilbur. However, that action is shown to have been dismissed without prejudice some six months later by stipulation and agreement of all parties, and Ella is not now challenging the judgment entered in the court below.

The defendant launches a third attack going to jurisdiction, namely, that judgment was entered for the benefit of persons not parties to the action.

As defense counsel points out, the general rule is that a judgment may not be rendered for or against one who is not a party to the action or who did not intervene therein. (46 Am. Jur. 2d, Judgments, § 87, p. 373.) This rule however is not without its exceptions. (*Kansas Physicians' Service v. Employers Liability Assurance Corp.*, 196 Kan. 204, 409 P. 2d 991.)

It is well to keep in mind that three of the Winsor children have been before the court since the inception of this litigation. Two of them, John Winsor and Mabel Molzen are plaintiffs, maintaining the action against Sarah as co-executors of their father's estate. The third child appearing in court is Sarah, herself, the defendant. It is true that John and Mabel appear throughout the litigation as co-executors. Nonetheless we believe they would personally be bound by whatever judgment is finally rendered in this case. Such appears to have been admitted by Sarah's counsel when, on opposing a motion by the remaining Winsor children to intervene, counsel said "that being here as co-executors they [John and Mabel] are within the personal jurisdiction of the court. It is immaterial that they have purported to conduct this litigation only as co-executors."

There can be little doubt that John and Mabel, in maintaining this action against Sarah, were actively serving and acting in the interests of the other three children as well as their own. Moreover, we are inclined to believe the other three were not inactive themselves. At the commencement of the trial, defense counsel made this revealing comment:

". . . The other members of the family are the plaintiffs in this proceeding here or at least are collaborating with the co-executors as plaintiffs. . . ."

In the Restatement of the Law, Judgments, § 84, p. 390, we find the following principle set forth. We deem it pertinent here:

"A person who is not a party but who controls an action, individually or in co-operation with others, is bound by the adjudications of litigated matters as if he were a party if he has a proprietary or financial interest in the judgment or in the determination of a question of fact or of a question of law with reference to the same subject matter or transaction; if the other party has notice of his participation, the other party is equally bound."

Furthermore, we think it may safely be said that Sarah would in nowise be precluded from asserting whatever defenses she might have to the charges leveled against her, simply because three of the beneficiaries of the purported trust were not named as parties plaintiff. In *Rullman v. Rullanm*, 81 Kan. 521, 106 Pac. 52, it was said by this court:

"The defendant has a right to insist that an action against him shall be brought by the real party in interest, as the statute provides, but the purpose of the statute has been attained if the defendant is not shut out from defenses and counterclaims and will be fully protected by the judgment from any further liability on the same cause." (Syl. ¶ 3.)

The case of *Lessert v. Krebs*, 108 Kan. 752, 196 Pac. 1070, serves to point out that under certain conditions a judgment may be entered for one who nominally is not a party. The facts of that case are somewhat difficult to capsulize. It will be sufficient to say that it was a replevin action in which judgment was ultimately entered in favor of one who paid off the plaintiff's mortgage after suit was started but who was never made a party to the action. In upholding the judgment on appeal, this court said:

"It is claimed that because Ella Plomondon [who paid the mortgage] was never made party to the action judgment could not be rendered in her favor. She could have been made a party, and, on her application, probably would have been substituted for the plaintiff. If it were right and proper that judgment be rendered in her favor had she been a party, the court could and probably did consider her as such. Being entitled to subrogation to the rights of the plaintiff, there was no reversible error in rendering judgment in her favor." (p. 754.)

We might add at this point that the three other Winsor children attempted to intervene in this case after the judgment was entered and before notice of appeal was filed, and their motion is still pending in district court.

We believe the defendant's challenge to jurisdiction must be rejected and we shall proceed to consider what, in our opinion, is the hard core of this lawsuit, *i. e.* whether or not Sarah as the sur-

viving joint tenant holds title to Wilbur's property as trustee for all of the Winsor children.

The doctrine of joint tenancy has been recognized in this state for a good many years. (*Malone v. Sullivan,* 136 Kan. 193, 14 P. 2d 647.) It applies to personal as well as to real property. (*In re Estate of Biege,* 183 Kan. 352, 327 P. 2d 872.) Much judicial thought and attention has recently been bestowed by this court upon the doctrine as it relates to personal property. (*Miller v. Higgins,* 188 Kan. 736, 366 P. 2d 257; *Simonich, Executrix v. Wilt,* 197 Kan. 417, 417 P. 2d 139; *In re Estate of Smith,* 199 Kan. 89, 427 P. 2d 443; *Bowen, Administrator v. Hathaway,* 202 Kan. 107, 446 P. 2d 723; *Edwards v. Ledford,* 201 Kan. 518, 441 P. 2d 834; *In re Estate of Johnson,* 202 Kan. 684, 452 P. 2d 286; *Agrelius v. Mohesky,* 208 Kan. 790, 494 P. 2d 1095.) Our decisions have dealt mainly with joint bank and savings accounts, but we are aware of no rule which would exclude mutual fund shares from the doctrine. In 20 Am. Jur. 2d, Cotenancy and Joint Ownership, § 10, pp. 101, 102, we find the statement:

"It is generally recognized that a joint tenancy in corporate stock may be created by the surrender of the certificate and its reissuance to the holder and another as joint tenants. . . ."

From the cases cited, and the list is by no means exhaustive, certain rules have emerged which are presently recognized in this jurisdiction; that a joint tenancy relationship stems from a contractual arrangement which confers equivalent legal rights and obligations upon the parties concerned; that the relationship is governed by principles of contract law; that the all-important factor in the establishment of a valid joint tenancy relationship is the clarity with which the grantor's intent is expressed at the time the transaction is initiated; that where the intent to create a joint tenancy is clearly manifested a joint tenancy may be created by a transfer to persons as joint tenants from an owner or a joint owner to himself and one or more persons as joint tenants (see K. S. A. 58-501 [a]); that where, in a written grant or agreement, the magic words "as joint tenants with rights of survivorship" are used, the grantor's intention is clearly manifested and, in the absence of fraud or mutual mistake, parol evidence is not admissible to explain or vary the terms of the instrument.

Specifically calling our attention to the *Simonich* and *Smith* cases, Sarah argues, in effect, that her father's intention to create a

joint tenancy is clearly expressed by his use of the so-called "magic words"; that there is no ambiguity in the instruments creating the several joint tenancies; and that parol evidence was not admissible to explain or vary the provisions thereof.

We have no quarrel, in general, with Sarah's diagnosis of the *Simonich* and *Smith* opinions. In both cases the magic words were used and we held them sufficient to manifest the intention to create a joint tenancy. However, those decisions do not dispose of the problem which, as we see it, confronts us here. Although Sarah, as the surviving joint tenant, may possess title to the property conveyed, we believe the essential question is whether the circumstances surrounding this case are such as to impress a trust upon the property to which she holds the legal title.

The problem is not without its complications. Nevertheless, the trial court concluded that a trust relationship existed between Sarah and her brothers and sisters, and we believe its conclusion in this regard is born out by the record. As we view them, the rules which relate to trusts are applicable when property is titled in joint tenancy as well as when property is otherwise held. We are not persuaded that ownership in joint tenancy is incompatible with the legal concepts which govern the field of trusts, or that joint tenancy ownership was ever intended as a device to cloak injustice or to excuse overreaching. Such is the rationale underlying our opinion in the recent case of *Grubb, Administrator v. Grubb,* 208 Kan. 484, 493 P. 2d 189, where we applied the doctrine of constructive trusts in relationship to funds held in joint tenancy bank accounts.

It is not clear from the record whether the trial court intended to find that an express trust had been established, or whether the trust was constructive in character. However, we find it unnecessary to determine that particular point, for we deem the evidence sufficient to establish that Wilbur intended Sarah should hold the property for the benefit of the Winsor children; that Sarah so understood, and accepted the title on that basis; and that subsequently, and after Wilbur's death, Sarah repudiated her obligation. Under such circumstances it would appear that, at the very least, the seeds of a constructive or resulting trust were sown. (*Witmer v. Estate of Brosius,* 184 Kan. 273, 336 P. 2d 455.)

The record clearly indicates that Wilbur intended to treat his children alike. That intent is manifested by frequent statements made by Wilbur himself, as well as by the contents of his will, which

he never revoked. Moreover, it is disclosed by the record that Wilbur had said, at one time, that he believed he had matters arranged so his property would be passed to his children and—at that particular time—to Ella. He is shown as having said, in this connection, that "Sadie's all right (referring to Sarah). She'll do the right thing."

Wilbur's intention is further born out by Sarah's own statements that the children were to share equally in their father's property. Assertions to this effect were made at the very time Sarah was taking pains to conceal the fact of her joint ownership. An episode occurring in the office of the Winsor family lawyer is revealing. In reporting on her stewardship of Wilbur's affairs while acting under his power of attorney, Sarah prevailed upon the attorney to exclude from her accounting the fact that she held the mutual shares in joint tenancy, her plea being there was enough trouble among the six of them as it was. At the very same time Sarah asserted that she was not claiming ownership; that it all belonged to the kids; and that she was to divide it with the other kids. Even after her father's death, Sarah obliquely recognized an obligation in this respect when, at a family meeting, she said she would divide the property with some but not all of her brothers and sisters. This recognition, however, appears to have been of short duration.

It is true that in transferring his property into joint tenancy, Wilbur used none of the terms commonly associated with trusts, but the circumstances in their totality show his intention that the properties be held for the benefit of his children. In *Andrews v. Hochmuth*, 253 Or. 313, 454 P. 2d 636, it was said:

"No particular form of words is required to create a trust, and whether one exists is to be ascertained from the intention of the party as manifested by the words used and the surrounding circumstances. . . ." (p. 317.)

(See, also, *In re Estate of Dieter*, 172 Kan. 359, 239 P. 2d 954.)

Sarah's declarations evidence her personal understanding of Wilbur's intention. Her statements and actions also indicate her acceptance of the property on the basis of that understanding. The record reflects an incident in which Sarah, after "considerable persuasion" prevailed upon her father to transfer some savings accounts into joint tenancy ownership by advancing the argument that he would want his children to have the money rather than Ella. In Restatement of the Law, Second, Trusts, § 24, Mode of Manifestation of Intention, p. 67, the rule is discussed:

"(1) Except as otherwise provided by statute, the manifestation of intention to create a trust may be made by written or spoken words or by conduct.

. . . . . . . . . . . . . . .

". . . Acts prior to and subsequent to, as well as acts contemporaneous with the manifestation which it is claimed creates a trust, may be relevant in determining the settlor's intention to create a trust."

The following illustration is set out on page 68:

"1. A, the owner of certain bonds, declares that he holds the bonds 'for the use of B' or 'for the benefit of B.' In the absence of evidence of a contrary intention, A holds the bonds in trust for B."

No contrary intent on the part of Mr. Winsor may be inferred in this case. Neither did Sarah ever publicly manifest a different intention until after her father was gone. Until that time she continued to acknowledge, so far as her siblings were concerned, that her father's property was to go to all his children.

Where the effect of a conveyance of property becomes an issue, the grantor's intention is of significance. In Restatement of the Law, Property, § 11d, p. 31, the rule is stated:

"In determining whether a conveyance is, or is not, effective, and if effective, just what its effect is, the intent of the conveyor is always an important, and often the decisive factor. . . ."

In *Voelkel et al. v. Tohulka et al.*, 236 Ind. 588, 141 N. E. 2d 344, 70 A. L. R. 2d 1349, we find a good many similarities to the picture presented in the instant case. In that lawsuit a soldier named his sister as beneficiary in his policy of insurance, relying on her agreement that in case of his death she would divide the proceeds among his brothers and sisters. When the insured was later killed in action the sister, much like the defendant here, had a change of heart and refused to "divvy up." In deciding that the recalcitrant sister held the insurance proceeds as trustee, the Indiana court said:

". . . An orally expressed trust may be created in personal property held and owned by a person, at any time by the mere declaration that it is so held. No formal words are necessary if the intentions as well as the terms are plain. . . ." (pp. 601, 602.)

But the defendant insists that parol evidence was not admissible to show Wilbur's intention or to vary the terms of the several joint tenancy instruments, and she cites the *Smith* and *Simonich* opinions, among others. However, we have been careful to point out that the parol evidence rule is applicable where joint tenancies are created, *in the absence of fraud or mutual mistake.* No breach of a confidential relationship made its appearance in either the *Smith* or *Simonich*

cases, and herein lies a substantial distinction. The trial court found that Sarah had exerted undue influence. That finding implies the existence of a confidential or fiduciary relationship between Sarah and her father—an implication which we believe is sustained by the evidence. The existence of such a relationship required the exercise of the utmost good faith on the part of Sarah.

Not only do portions of the evidence already detailed suggest a devious design on the defendant's part, but her repudiation of the understanding on the basis of which she acquired her title infers a tortuous scheme for obtaining the property.

In *Jarkieh v. Badagliacco*, 75 C. A. 2d 505, 170 P. 2d 994, a case in which joint tenancy bank accounts were involved, the appellate court said:

". . . It is elementary law that upon proof of a transfer made in reliance upon an oral agreement to hold in trust, and upon proof of the subsequent repudiation of this agreement, the trier of fact may infer that the maker of the promise had the intention not to perform at the time the promise was made. That is actual fraud. . . . The subsequent repudiation relates back to the original promise. . . ." (pp. 508, 509.)

In the *Jarkieh* case the California court also iterates the rule that even though a writing purports to make an absolute transfer, extrinsic evidence may be offered of a collateral agreement to hold the property as security *or in trust.* (*Estate of Gaines,* 15 Cal. 2d 255, 100 P. 2d 1055; 9 Wigmore on Evidence, Third Edition, § 2437; *Klusmire v. Dixon,* 150 Kan. 871, 96 P. 2d 634.) In *Roseman v. Nienaber,* 100 Kan. 174, 166 Pac. 491, this court has said:

". . . The parol evidence rule does not exclude proof of the true consideration of written instruments. The situation of the parties and the circumstances under which written instruments are executed and delivered may be shown by parol in aid of interpretation. . . ." (p. 176.)

Further discussion would add nothing further of value to this already protracted opinion in Sarah's case, and we affirm the judgment entered therein.

We now turn to the case against both Leslie A. Powell and Sarah. The record reflects that shortly after Mr. Winsor's death, three certificates (one representing a small stock dividend) for a total of 20 shares of stock in the Marion National Bank were found to be in the names of "W. M. Winsor and/or Leslie A. Powell, as joint tenants with right of survivorship and not as tenants in common." These were turned over to Mr. Powell and he later had them transferred to himself and Sarah in joint tenancy.

As to the stock certificates the trial court entered the following finding:

"The court finds that the stock certificates in the Marion National Bank were an inter vivos gift to Leslie A. Powell created by joint tenancy, and were so intended by the donor Wilbur M. Winsor; that delivery of said inter vivos gift was constructive and acceptance implied by virtue of its beneficial nature to the donee."

Pursuant to this finding, judgment was entered in favor of Leslie and Sarah as to the bank stock.

The plaintiffs challenge this judgment as being unsupported by the evidence. They argued there was no delivery, actual or constructive.

In summary, the evidence discloses through the testimony of Mr. Kreuter, who was president of the bank, that in 1956 Mr. Winsor brought the certificates to him at the bank and asked him to make them into joint tenant ownership; that Kreuter then typed on the certificates the additional words "and/or Leslie A. Powell as joint tenants with right of survivorship." New certificates were not issued at the time, but the record indicates that the certificates were placed in a safety deposit box standing in the joint names of Wilbur and Sarah and in which some of Mr. Powell's securities were also kept.

We believe the evidence is sufficient to support the court's conclusions as well as the judgment entered in favor of Leslie and his wife. Mr. Powell was a business man in Marion. There is evidence that on a former occasion Mr. Winsor had talked to Leslie about his becoming owner of the stock and said he would like to turn it over to him so that he might be a director. Although Leslie did not accompany his father-in-law to the bank on the occasion when Wilbur directed Mr. Kreuter to add Leslie's name to the certificates, and although Leslie did not recall Wilbur ever telling him that he had put the stock in his name, his consent to the gift may be presumed in the absence of evidence to the contrary. (*Mahoney v. Martin,* 72 Kan. 406, 410, 83 Pac. 982.

For a gift to be effective there must have been a delivery, but the delivery may be constructive as well as manual. (*Hudson, Administrator v. Tucker,* 188 Kan. 202, 361 P. 2d 878.) Mr. Powell contends, citing authorities, that Wilbur, having placed his stock in joint tenancy, surrendered his exclusive possession and control thereof and nothing more remained to make the gift complete; that each co-owner had an equal right to possession and that the pos-

session of one was the possession of the other as well, *i. e.*, that Wilbur's possession was Leslie's also. (*Bunt v. Fairbanks,* 81 S. D. 255, 134 N. W. 2d 1; *Frey v. Wubbena,* 26 Ill. 2d 62, 185 N. E. 2d 850.)

We are inclined to the view that Wilbur, in having his banker make out the certificates to Leslie and himself, as joint tenants, and having them placed in a deposit box to which both Wilbur and Leslie's wife had keys, and in which some securities belonging to Leslie were kept, may be deemed to have made a constructive delivery of the stock and that the trial court was justified in upholding the transfer as a gift. (*Agrelius v. Mohesy,* supra.)

In concluding that the judgment entered on behalf of Mr. and Mrs. Powell is supported by sufficient competent evidence, we might say there is no evidence of a confidential relationship between Mr. Winsor and Mr. Powell, and no suggestion of overreaching on the latter's part.

The trial court's judgment is affirmed in each case.