No. 47,142

Walter Wehking, Hulda Kanning and Mary Gunter, *Appellees,* v. Gilbert Wehking, Elsie Wehking and Helen Gigstad, *Appellants.*

(516 P. 2d 1018)

Opinion filed December 8, 1973.

*Eugene W. Hiatt,* of Hiatt & Spurgeon, Chartered, of Topeka, argued the cause, and *Kenneth F. Crockett,* of the same firm, was with him on the brief for the appellant.

*Jack R. Euler,* of Euler and Euler, argued the cause, and *J. D. Euler,* of the same firm, was with him on the brief for the appellee.

The opinion of the court was delivered by

Fontron, J.: This bitter battle is waged between siblings, the children of Christ Wehking. Mr. Wehking was a dirt farmer and long time resident of Atchison County. He died March 17, 1966,

leaving a second wife, two sons and three daughters. He also left the basic ingredient of this lawsuit in the form of a $10,000 joint tenancy savings account in an Atchison bank.

It happened this way: On March 23, 1954, Mr. Wehking opened a $6000 joint saving account in the Exchange National Bank of Atchison. He placed the account in the names of Gilbert Wehking and his wife Elsie, with rights of survivorship. Gilbert testified that his father came to his home in the evening and threw the savings account book on the table; that he and his wife looked at it and saw the amount made out to them; that there was no conversation about the $6000; and that his father did not indicate anything that he was to do with it. Neither Gilbert nor Elsie ever put any money into the account nor did they ever draw any out, until after Christ's death. The account grew, however, with the accumulation of interest.

On February 2, 1959, Gilbert grew tired of paying income taxes on the interest accruing to the account and on February 2, 1959, he added Christ's name to the account which then contained over $8000. The new account was placed in the names of Christ Wehking, or Gilbert Wehking or Elsie Wehking. Thus the account remained until some two months prior to Christ's death. On January 18, 1966, Gilbert "took [his] father's name off the account" and opened a new account in Elsie's and his own name. Before doing so, however, he discussed with his brother, Walter, how Christ's second wife, Anna, could be prevented from getting any part of it. By this time the account had increased to something over $10,000.

Sometime in June, 1966, Gilbert closed the joint tenancy savings account and transferred the proceeds first to a checking account in a Lancaster bank and later to a bank at Everest. The transfer of the funds caused considerable fur to fly and Walter soon filed an action to compel Gilbert to account for the moneys allegedly belonging to Christ's children. A second action was filed by brother Walter and sisters Hulda Kanning and Mary Gunter in March of 1968, alleging that Gilbert held the money in trust for all five Wehking children and praying judgment for their respective one-fifth shares therein. Helen Gigstad, the third sister, was joined as a party defendant along with Gilbert and Elsie. Thus it was that three of the Wehking children were arrayed on one side of

the controversy against the other two. The two lawsuits were tried together and are consolidated on this appeal.

After making extensive findings of fact the trial court concluded that Christ Wehking did not intend to make an *inter vivos* gift to Gilbert or Elsie but that he intended to and did create an oral trust for the equal benefit of his five children through his establishment of the joint tenancy savings account. Having so concluded, the court ordered Gilbert and Elsie to deliver to each of Gilbert's siblings, Walter, Hulda, Mary and Helen, a one-fifth part of the moneys which were in the saving account plus accumulated interest. Gilbert and Elsie took an appeal from that judgment. Elsie has died during the pendency of the appeal leaving Gilbert as the only appellant.

As we see it, the essential thrust of Gilbert's argument on appeal is simply that the evidence is not sufficient to establish the creation of an oral trust and that the findings and conclusions of the trial court are not supported by the evidence.

We do not intend to engage in an extended discussion of oral trusts, but pause for the moment to say that the validity of a trust in personalty established by parol has long been recognized in this state. (*Diller v. Kilgore*, 135 Kan. 200, 9 P. 2d 643; *Shumway v. Shumway*, 141 Kan. 835, 44 P. 2d 247.) More recently we have held that personal property titled in joint tenancy may be the subject of a trust, as well as property which is otherwise held; that while legal title to a joint tenancy bank account or other similar property may vest in the survivor, the equitable or beneficial interest may be in another, in which event equity may impress a trust upon the fund or the account to prevent injustice. (*Winsor v. Powell*, 209 Kan. 292, 497 P. 2d 292; *Grubb, Administrator v. Grubb*, 208 Kan. 484, 493 P. 2d 189.)

There is considerable evidence throughout this record that Mr. Wehking wished all five of his children to share in his worldly goods. At the time he gave up active farming operations and moved to Huron with his second wife, he divided his farm holdings with his children, although not on an entirely equal basis, for the two sons appear to have received the larger part of his real estate. After having established the joint tenancy savings account in the names of Gilbert and Elsie, Mr. Wehking reportedly made statements to Hulda and to Walter to the effect that he was saving for

the kids; that he had a savings for them; that he was going to surprise them; that there was money for the kids; that the savings account was to be used for the children, but only he and Gilbert would know the amount. But this is not the only evidence of his intent.

In *Winsor v. Powell,* supra, we stressed the importance of statements and declarations made by a putative trustee in establishing or arriving at the intention of a grantor or settlor who has placed property in the hands of another. There is a good deal of evidence along that line in the present case. We have already referred to the conversation between Gilbert and his brother Walter held sixty days before their father's death, as both of them testified, in which the two were discussing ways to cut their stepmother out of any share or interest in the account. What transpired at this kindly conference might well be construed as a tacit acknowledgment on Gilbert's part that his was not the only interest in the fund to be safeguarded from a possible onslaught by Anna but that his brother, as well, had an interest in the account to be protected. The record contains other testimony by Gilbert himself which reflects an understanding on his part that he was to divide the money, although he stated he was not going to settle it until he got good and ready, and then in his own way. Similar testimony as to Gilbert's attitude came from brother Walter. On the day of the funeral, so Mary testified, Gilbert asked her if she knew how much there was in the savings account for the children, and told her that if she needed money he could give her some. Mary was too grief stricken to discuss such mundane matters at that time, but a couple of letters addressed to him by Mary a short time later met with the response to see his lawyer.

Other bits of evidence tending to sustain the trial court's findings will not be set out at this time since we believe the testimony already cited provides a sufficient basis of support for the judgment.

We are aware of the rule which is cited by the defendants that clear and convincing evidence is required to establish an oral trust or, as the rule is sometimes similarly expressed, a high or strict degree of proof is required for that purpose. (30 Am. Jur. 2d, Evidence, § 1167, p. 344; 54 Am. Jur., Trusts, § 620, pp. 478-480.) Recognition was accorded to this rule and its application was discussed in *Hoover v. Hopkins,* 122 Kan. 65, 251 Pac. 411. That action was

one to impress a trust upon the estate of a testator which was in the possession of his widow as sole devisee for the benefit of his children. The trial court entered judgment in favor of the children. In an opinion upholding the judgment, this court said:

". . . Was the decision contrary to the evidence? The principal contention is, the decision was contrary to the evidence, because in this class of cases the law requires proof to an exceptional degree of certainty. Various statements of the rule are quoted, as that the proof must be 'clear and convincing,' 'conclusive,' 'practically overwhelming,' and 'overwhelming.' All the authorities agree that a high degree of certainty is required, and the superlatives are employed in an effort to fend against the danger attending application of a doctrine inherently dangerous.

"*The rule relating to certainty of proof is one for the district court to observe.* The subject is not a new one here. In criminal cases, guilt must be proved beyond a reasonable doubt, and if the evidence to support conviction be circumstantial, it must be incompatible with any reasonable hypothesis except guilt. When the trier of the fact is satisfied, the function of this court is limited to ascertaining if there is any substantial evidence to sustain the verdict of guilty (*State v. Brizendine,* 114 Kan. 699, 220 Pac. 174). The same rule applies when the question is whether a special standard of proof has been met in a civil case (*Leverton v. Rork,* 74 Kan. 832, 85 Pac. 800; *Wooddell v. Allbrecht,* 80 Kan. 736, 104 Pac. 559). . . ." (Emphasis supplied.) (pp. 66, 67.)

We view the present case as essentially a fact case. Our role on appeal, as was so clearly pointed out by this court in the *Hoover* opinion, is simply to ascertain whether there is any substantial competent evidence to sustain the trial court's findings and judgment, it being assumed that the court applied the correct standard of proof and was satisfied with the quantum of evidence introduced.

The rules which an appellate court must follow in judging the sufficiency of evidence in a given case have been repeated many times and should, by now, be familiar to every member of the practicing bar. As an appellate court we are not concerned with conflicting evidence, nor with the weight and credibility to be accorded the testimony of the witnesses; responsibility in these areas rest with the trial court, which is in a far better position to judge of such matters than are we. Our interest is directed only to such evidence as supports the findings of the trial court and not to that which might tend to establish contrary findings or a different result. We are required to accept the evidence which is most favorable to the prevailing party and where there is substantial competent evidence in the record to sustain the judgment, it is our duty to

sustain it, rather than to speculate as to what other dispositions the record might support. (See 1 Hatcher's Kansas Digest [Rev. Ed.], Appeal & Error, §§ 502-508.)

A suggestion is found in Gilbert's brief that the action filed against him in March, 1968, in which Hulda and Mary joined forces with Walter, was barred by the statute of limitations. This point was not mentioned at oral argument and we consider it abandoned as having no merit—an appraisal in which we join.

We are constrained to affirm the judgment and it is so ordered.