**In re Gary J. MacDONALD and Christina F. MacDonald, Debtors.**

**Maurice M. CAHILLANE, Trustee, Plaintiff,**

v.

**Gary J. MacDONALD and Christina F. MacDonald, Defendants.**

**Maurice M. CAHILLANE, Trustee, Plaintiff,**

v.

**Gary J. MacDONALD, Earl MacDonald, Greg MacDonald, Linda MacDonald and Spectrum Wire Corporation, Defendants.**

**Bankruptcy No. 87–40365–JFQ. Adv. Nos. 88–4003, 88–4022.**

United States Bankruptcy Court, D. Massachusetts.

June 15, 1989.

Maurice M. Cahillane, Egan, Flanagan & Egan, Springfield, Mass., trustee.

Joseph Reinhardt, Hendel, Collins & Newton, Springfield, Mass., for MacDonalds debtors/defendants.

Darragh K. Kasakoff, Seder & Chandler, Worcester, Mass., for Earl MacDonald, Greg MacDonald, Linda MacDonald and Spectrum Wire Corp./defendants.

## OPINION

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

## I. GENERAL FACTUAL OUTLINE

In these two adversary proceedings, Maurice M. Cahillane, the trustee in bankruptcy (the "Trustee"), asserts that the capital stock of Spectrum Wire Corporation ("Spectrum") is beneficially owned by the

Chapter 7 debtor, Gary J. MacDonald (the "Debtor"), either singly or jointly with his co-debtor wife. In No. 88–4003 the Trustee seeks an order denying both debtors a discharge in bankruptcy by reason of their having concealed property of the estate within the meaning of 11 U.S.C.S. § 727(a)(2) (Law Co-op.1987 and Supp. 1988). In No. 88–4022 the Trustee seeks turnover to the estate of the stock certificates of Spectrum standing in the name of the Debtor's father, Earl MacDonald, and the Debtor's brother, Greg MacDonald. Set forth here are the Court's findings of fact and rulings of law following a consolidated trial of both adversary proceedings.

For many years, the Debtor held various sales management positions with American Saw & Manufacturing Co., while at the same time successfully investing in real estate on a part-time basis. He usually took title to properties under the name Multiplex Realty, an unincorporated sole proprietorship, and eventually formed a real estate management corporation, Spectrum Management, Inc. In late 1984 he left the saw company and purchased all of the capital stock of State Wire & Cable Corp. ("State Wire") in a $2.4 million leveraged buyout in which he and his wife took joint title to 100 of the corporation's outstanding shares and State Wire redeemed the remaining 900 shares. The sale was made largely on credit through promissory notes payable to the selling stockholders, William and Charlotte Ford (the "Fords"); payment of State Wire's note was guaranteed by the Debtor. He thereafter devoted most of his time to the management of State Wire, serving as its president. His brother, the defendant Greg MacDonald, was the corporation's sales manager. His father, Earl MacDonald, had retired in 1979 from his employment of thirty-four years with J.C. Tarbell Co., a division of Chrysler Corporation. The father held no office in State Wire, but worked for it on a part-time basis taking care of the grounds and performing errands. Bay Bank Valley Trust Company ("Bay Bank") was the corporation's principal lender under a revolving loan arrangement guaranteed by the Debtor and granting Bay Bank a security interest in State Wire's equipment, inventory, receivables and other property. Bay Bank also held a mortgage on the corporation's plant owned by the Debtor through a trust. After the purchase, State Wire's sales increased sharply, mostly from the manufacture and sale of wire for the building industry; its other sales were evenly divided between thermostat wire and telephone wire. The operating results quickly changed from a profit to a loss, largely because of losses in the sales of building wire, which has a highly competitive market.

Defaults arose under the obligations owed Bay Bank and the Fords. In December of 1985, just a year after the purchase, State Wire was forced to accede to Bay Bank's security rights by surrendering possession of all its assets to the bank in lieu of an involuntary foreclosure. Spectrum played a role in this arrangement. On December 19, 1985 articles of organization were signed incorporating Spectrum and naming Earl MacDonald, the Debtor's father, as its president, treasurer, clerk and sole director. The only stock issued at that time was 120 shares of Class A voting stock issued to the father. Spectrum and Bay Bank then entered into an arrangement whereby Spectrum agreed to act as the bank's foreclosure agent to complete work in process and pending contracts, and to wind down all of State Wire's operations.

By March of 1986 Spectrum's role as the bank's foreclosure agent was largely completed. Spectrum then commenced its own wire manufacturing operations, using the same plant owned by the Debtor and the equipment which the bank had repossessed. Spectrum paid rent on the equipment to Bay Bank and rent on the real estate to the Debtor through making the monthly payments due Bay Bank under his mortgage. The sum of $198,800 was obtained from the Debtor's father, Earl MacDonald, who advanced that amount in March of 1986 as a loan, having paid $1,200 the previous December for 120 shares of stock. Of the total $200,000, $37,500 was treated as a capital contribution for which 1000 shares

of Class A voting stock were issued, and $162,500 was treated as a loan. In April of 1986 the Debtor's brother Greg furnished $70,000 to Spectrum, receiving 100 shares of Class A voting stock for a $16,250 capital contribution and a note for the balance of the funds. Those were the only shares issued, and they remain outstanding. Spectrum prospered, concentrating on sales of profitable thermostat wire and telephone wire. The Debtor directed its operations, as he had previously directed those of State Wire, and his father continued to perform the same type of odd jobs on a part-time basis that he had performed for State Wire. On September 26, 1986 the Debtor replaced his father as president, and the Debtor's mother replaced his father as treasurer. At the same time, the number on the board was increased to three, with the Debtor and his brother joining their father as directors.

On December 30, 1986 an agreement was reached among Bay Bank, State Wire, Spectrum and the Debtor whereby (i) Bay Bank sold the surrendered equipment and the remaining surrendered inventory to Spectrum, (ii) the Debtor released Bay Bank of a lender liability claim which he had been espousing, (iii) the Debtor gave Bay Bank a $90,000 note secured by a mortgage on his home, and (iv) Bay Bank released the Debtor from a potential deficiency liability of some $500,000 under his guaranty of State Wire's indebtedness. The Debtor remained liable to the Fords under his guaranty of payment of the purchase price for their capital stock of State Wire. The Fords sued him for $1 million, obtaining an attachment on his home. On July 6, 1987 the Debtor and his wife filed a joint petition in this Court requesting a discharge of their debts under Chapter 7 of the Bankruptcy Code. Their schedules filed with the petition listed no ownership interest in Spectrum. The principal liabilities listed were the $1 million disputed claim of the Fords and millions of dollars in disputed "transferee liability" concerning trade debt of State Wire.

The foregoing sets forth the Court's findings of fact in general outline. Additional findings appear with the discussion of applicable legal principles.

## II. THE BANKRUPTCY ESTATE AND EQUITABLE PROPERTY INTERESTS

### A. *Resulting or Constructive Trusts*

The Trustee contends that at the time of the bankruptcy filing the Debtor was the beneficial or equitable owner of all of the outstanding capital stock of Spectrum. The bankruptcy estate of course includes any non-exempt equitable property interests owned by the Debtor at the commencment of the case. 11 U.S.C.S. § 541 (Law Co-op.1986 and Supp.1988).

The Trustee does not specify the legal theory under which he says that beneficial ownership of Spectrum resides in the Debtor. The Spectrum shares cannot be regarded as held by the father or brother in resulting trust for the Debtor. A resulting trust can exist only in one of three circumstances, none of which is present here: (i) where property is purchased and the one furnishing the consideration directs that title be taken in the name of another; (ii) where an express trust is fully performed without exhausting the trust estate, and (iii) where an express trust fails in whole or in part. *Restatement (Second) of Trusts*, ch. 12 gen. prin. (1957); *Meskell v. Meskell*, 355 Mass. 148, 243 N.E.2d 804 (1969) (resulting or constructive trust denied in real estate; statute of frauds prevented creation of express trust). *See generally, Checovich v. Checovich*, 339 Mass. 71, 157 N.E.2d 643 (1959) (son deemed to hold real estate under resulting trust for benefit of father who furnished consideration); *McPherson v. McPherson*, 337 Mass. 611, 150 N.E.2d 727 (1958) (general rule that resulting trust arises for benefit of party furnishing consideration subject to qualification that where transferee is that party's wife a gift is presumed to be intended); *In re Snider Bros., Inc.*, 12 B.R. 87 (Bankr.D.Mass.1981) (resulting trust arose through failure of express trust due to lack of transfer of insurance policies to bank which had agreed to hold them in trust to fund deferred compensation agreement). There was no evidence, nor does

the Trustee contend, that the Debtor furnished the consideration for the shares of the father or brother, or that there exists either of the other two circumstances which can give rise to a resulting trust.

The principles of a resulting trust can nevertheless be instructive on the present issue. The Supreme Judicial Court of Massachusetts has had occasion to recognize the existence of a resulting trust in the context of pending creditor claims. In *Rand v. Goldblatt*, 347 Mass. 566, 199 N.E.2d 207 (1964), a partnership was placed into a Chapter XI proceeding; a new corporation was organized and largely funded by one of the partners; it issued stock to that partner's father-in-law who was named president and treasurer; the Chapter XI receiver then sold the assets of the partnership to the new corporation, which the former partner thereafter managed. Citing resulting trust decisions, the Court ruled that there was ample evidence supporting the trial judge's finding that the father-in-law was not intended to be the beneficial owner of the stock, and it ordered the stock transferred. These facts are quite close to those of the case at bar, and the principles are essentially the same, except that here no resulting trust can exist because the record owners furnished the consideration. *See also Gerace v. Gerace*, 301 Mass. 14, 16 N.E.2d 6 (1938) (resulting trust arose in favor of son who furnished purchase price from his own funds and loan from father, taking title in name of father because son had been through bankruptcy without receiving a discharge of his debts).

■ Nor can the Debtor's father or brother be regarded as holding Spectrum's stock in constructive trust for the Debtor's benefit. A constructive trust is "a device employed in equity, in the absence of any intention of the parties to create a trust, in order to avoid the unjust enrichment of one party at the expense of the other where the legal title to the property was obtained by fraud or in violation of a fiduciary relation or arose where information confidentially given or acquired was used to the advantage of the recipient at the expense of the one who disclosed the information." *Bar-*

*ry v. Covich*, 332 Mass. 338, 342, 124 N.E.2d 921, 924 (1955). *See Restatement (Second) of Restitution* § 160 (1937). There is no assertion that the Debtor's father or brother acquired the stock through fraud practiced on the Debtor or in violation of any obligation which they owed him. To the contrary, the Trustee charges that the three are acting in concert in a scheme to keep the Debtor's ownership of the stock away from his creditors, and that they have an understanding among them that the Debtor is the true beneficial owner.

The Trustee's case therefore rests on the intentional creation by the Debtor's father and brother of a trust in their shares for the Debtor's benefit, under traditional trust principles.

## B. Creation of Trust Under Traditional Trust Principles

■ A trust can be created by various methods, most commonly by the settlor transferring property to another in trust or manifesting an intention that he himself hold property in trust. *Restatement (Second) of Trusts*, § 17 (1957). The Debtor has made no transfer of these shares; they were acquired by the father and brother directly from Spectrum. The existence of a trust in the shares thus depends upon a manifestation of an intent by the Debtor's father and brother that they hold their shares in trust for the Debtor. Where, as here, the statute of frauds or wills has no application, the intention to create such a trust may be manifested by either words or conduct in light of all the surrounding circumstances, no particular form of words or conduct being necessary. *Restatement (Second) of Trusts*, § 24 (1957). A. Scott & W. Fratcher, *The Law of Trusts*, § 17.1 (4th ed. 1987); G.G. Bogert and G.T. Bogert, *The Law of Trusts and Trustees*, § 45 (rev. 2d ed. 1984). *See, e.g., Cooney v. Montana*, 347 Mass. 29, 196 N.E.2d 202 (1964) (trust for benefit of insured's children recognized in insurance proceeds paid to insured's sister, based upon conversation between insured and sister; no particular form of words deemed necessary); *Elyachar v. Gerel Corp.*, 583 F.Supp. 907 (S.D.N.

Y.1984) (controlling stockholder held to have impliedly created a trust of shares of family corporation for the benefit of his children and grandchildren through issuance of stock in their names and payment of dividends to them); *Trenton Times Corp. v. United States*, 361 F.Supp. 222 (D.N.J.1973) (profit sharing trust created through employer's conduct); *Winsor v. Powell*, 209 Kan. 292, 497 P.2d 292 (1972) (personal property in joint names of decedent and another held to be in trust for other children because of oral and written statements of decedent); *Hanley v. Bird*, 307 Pa.Super. 153, 452 A.2d 1360 (1982) (stock certificates transferred by father to two children held to be in trust for incompetent child because of father's strong bond for incompetent child); *Masterson v. Plummer*, 343 S.W.2d 352 (Mo.Ct.App. 1961) (certificate of deposit payable to son in event of mother's death deemed held by mother in trust and not an invalid testamentary disposition); *Compare* Mass. Gen.L. ch. 203, § 1 ("No trust concerning land, except such as may arise or result by implication of law, shall be created or declared unless by a written instrument signed by the party creating or declaring the trust or by his attorney."). I therefore turn to a determination of whether the Debtor's father or brother has indicated an intent, by words or conduct, that the shares standing in his name are held for the Debtor's benefit.

## C.  *Trust in Shares Held by Father*

■  Although intentions concerning some matters may be hidden, it is extremely difficult to do so when the subject is the controlling ownership interest in a small business. I find that the Debtor's father has manifested an intention to hold in trust for the Debtor the shares of Spectrum stock standing in the father's name, and that this has been done in two ways, either of which is legally sufficient: (i) he and the Debtor have verbally agreed that the Debtor is the beneficial owner of the shares and has the right to demand their transfer to the Debtor at any time, and (ii) the conduct of the father, when viewed with the conduct of the Debtor which has been assented

to by the father, indicates the father's intention to create such a trust. I base both of these general findings upon the credibility of the witnesses and the totality of the circumstances, including the following:

### 1.  Father's Testimony Concerning His Shares

The father's initial testimony was relatively candid; he never recanted this testimony when he took the stand a second time, although he obviously regretted his earlier candor. The father testified, in words or substance, that he furnished funds to Spectrum because his sons had had "tough luck" and were starting another business; that the amount of money furnished was determined by what his son Gary, the Debtor, needed to get the business going; that he had no understanding concerning whether the funds were for stock or loans; that there was no discussion of how he would get the money back because "if they are our children, then that's the way we looked at it;" that he admitted almost two years later, at his deposition, that he did not realize he had Spectrum stock standing in his name; that he just wanted to help Gary; and that he did what he was advised to do by Gary and Spectrum's accountant and lawyer.

### 2.  The Continuity of Debtor's Control of Both State Wire and Spectrum, and the Initial Attempt to Mask Debtor's Control of Spectrum

There was an obvious attempt from the beginning to hide the Debtor's role in Spectrum. Spectrum was always operated under the daily management and control of the Debtor, just as State Wire had been, and yet the Debtor's father held the title of president for the first several months until formally replaced by the Debtor in September of 1986. But the Debtor's signature appears as president on the certificates issued to the father and brother dated March and April of 1986. It was the Debtor who drew up Spectrum's business plan in February of 1986, a plan which made no mention of the father. The Debtor had signing and borrowing authority with Bay Bank

from the beginning. The father performs maintenance work and runs errands for Specturm, the same type of work which he performed for State Wire. He considers himself to have been retired since 1979 when he left the Chrysler division where he had been employed for thirty-four years. By his own admission, he knows nothing about the wire business. The Debtor has a thorough knowledge of the wire business, and has operated Spectrum successfully by profiting from his mistakes in running State Wire.

### 3. Absence of any Reason Other Than Fraud of Creditors for Debtor Not to Have a Beneficial Interest in Spectrum

Most of Spectrum's initial funding was treated as loans rather than contributions to capital, which is common. Given the Debtor's ability to obtain the relatively small amount required to purchase stock (either through loans to him from the father or financial institutions or through gifts from the father), there was no reason other than defrauding of creditors for the Debtor not to receive a substantial stock interest in Spectrum. His lack of ownership flies in the face of his entire history as an entrepreneurial owner in State Wire and in the real estate business.

### 4. Relative Compensation of Debtor and Father

Stockholders of small corporations traditionally obtain substantial income from the corporation through compensation for their services, receiving little or nothing in the way of dividends. Spectrum at all times paid substantial compensation to the Debtor and not to his father. The Debtor was initially paid an annual salary of $58,000, which was soon increased to $75,000 and then to $100,000 by the end of 1986. At all times he has been Spectrum's highest paid employee, even after he was recently replaced as president by one Thomas Copp. Moreover, in December of 1986, when Spectrum was about to become a subchapter S corporation under federal income tax law to obtain tax benefits, the Debtor received *advance* compensation of salary and bonus

totaling $100,000. The corporation also furnished him with a car worth $40,000 and paid his solely owned business, Spectrum Management, Inc., for such matters as recruiting services, snowplowing services and use of office furniture. The Debtor's father, on the other hand, receives compensation from Spectrum of only a few thousand dollars. When Spectrum became a subchapter S corporation, the father received income only in the amounts necessary to satisfy his increased tax obligation under subchapter S. He was not paid the full amount of income chargeable to him under federal and state tax law even though, as testified by Spectrum's accountant, any later dividend to him would likely bring about a second Massachusetts tax to him. His ability to obtain dividends was therefore severely restricted.

### 5. Absence of Delivery of Father's Stock Certificates

Stock certificates were prepared and signed in the father's name, but they were never delivered to him, remaining at all times in Spectrum's minute book kept at its attorney's office.

### 6. Disparity in Per Share Prices

A promoter and manager of a corporation often obtains his stock at a lower per share price than do the other investors, a practice which is often defensible on the theory that the promoter provides funds at an early and relatively risky stage of the corporation's evolution, and that he contributes intangible property such as "know-how". The Debtor was unquestionably the promoter and manager of Spectrum. The father's shares were issued somewhat earlier than were those of his brother Greg, and at a much lower per share price. The stock record book indicates that in December of 1985 the father was issued 120 shares for $1,200 at $10 per share, and in March of 1986 he received 880 shares for $36,300, about $41 per share. The Debtor's brother Greg, on the other hand, paid $16,250 for 100 shares in April of 1986, a per share price of $162.50. The comparatively low price for the father's shares is

some indication of a stock issuance to a promoter; that promoter was the Debtor.

### 7. Early Repayment of Father's Loan

Initial loans to a corporation by its controlling stockholders are usually payable over a long period of time in order to leave the new corporation with as much working capital as possible during its early stages. Here the father's $162,500 loan to Spectrum was paid at the rate of $10,000 per month beginning in October of 1986. It has already been paid in full.

### 8. Intermingling of Debtor's Personal Affairs With Spectrum's Corporate Affairs

One characteristic of an owner of a small corporation is his tendency to mix his personal affairs with those of the corporation, under the thinking that he owns everything. The Debtor certainly did this with Spectrum, with the full consent of his father. When Spectrum was operating in the plant in Westfield owned by the Debtor, Spectrum paid rent to the Debtor in the form of making his mortgage payments directly to Bay Bank. When Spectrum was acting as the Bank's foreclosure agent attempting to reduce the Bank's deficiency claim under the Debtor's guaranty, many of its operations were on a break-even basis. The bank paid all its expenses, but there was little or no profit in it for Spectrum. When Spectrum purchased equipment and inventory from Bay Bank on December 30, 1986, it paid the bank more than the liquidation value of the equipment, and the Debtor gave it a $90,000 mortgage note, all in consideration of the bank releasing the Debtor from a $500,000 deficiency claim under his guaranty of State Wire's debt. During much of 1988 the Debtor spent substantial portions of his working day in the formation (with ownership) of a new business, and yet he continued to draw his full salary from Spectrum.

### 9. Statements at § 341 Meeting

At the § 341 meeting conducted by the Trustee on August 4, 1987, the Debtor's counsel introduced the subject of the formation of both Spectrum and another company, EMD Corp.; the latter had been formed about the same time as Spectrum and had also issued all its stock to the Debtor's father. In the context of a discussion by the Debtor of EMD Corp. (in which he avoided reference to Spectrum), counsel said: "That after the business was closed it was obvious that Ford wasn't gonna get paid, and Gary had nothing. And it [sic] was absolutely no reason for him to form a business in his own name, individually, I mean that didn't make any common sense at all." Given the similarities in the formation of Spectrum and EMD Corp. (which soon ceased business), and given counsel's previous reference to the formation of both corporations, an inference concerning Spectrum can be drawn from these statements.

### 10. Ownership of Spectrum's New Plant

In early 1987 Spectrum moved to a new plant in East Longmeadow. The Debtor found this property and negotiated its purchase price. Title was taken by a partnership in which Spectrum was a partner. In light of the Debtor's involvement in this acquisition, his ownership of the previous plant, and his successful history in real estate investment, it is inconceivable that he would not take an ownership interest in the new plant.

### D. Shares Held by Brother

I am not persuaded that the 100 shares of Spectrum stock standing in the name of the Debtor's brother Greg are held by Greg in trust for the Debtor. Brothers do not stand in the same donative relationship as father and son. The brother's minority ownership position, moreover, is consistent with his full-time role in Spectrum and with the Debtor's desire, expressed at trial, that Greg have an interest in the Debtor's real estate business. Finally, Greg's shares were issued at a considerably higher per share price than the shares issued to the father for the Debtor's benefit, a disparity which is consistent with the relative roles of the Debtor and Greg in the enterprise.

## III. REMEDIES

The Trustee is therefore entitled under § 542 to a turnover of the stock certificates standing in the father's name. The Debtor's beneficial ownership of these shares at the time of the filing has been demonstrated by clear and convincing evidence, as required of turnover proceedings by *Maggio v. Zeitz*, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1948). The Trustee has also established that the Debtor has concealed these shares with the intent to hinder, delay or defraud his creditors within the meaning of § 727(a)(2), so that the Debtor is not entitled to a discharge of his debts. Disclosure of the father's legal ownership is clearly not enough. The Debtor has concealed his beneficial interest, and that concealment has continued up to the bankruptcy filing and thereafter. The Debtor's intentions in this concealment are patent.

The complaint in No. 88–4003 shall be dismissed as against Christina F. MacDonald, the Debtor's wife and a co-debtor in this bankruptcy case. There was insufficient evidence that she was intended to have any beneficial interest in shares standing in the name of either the father or brother.

Separate judgments shall issue.

## JUDGMENT

The Court having issued separate findings of fact and rulings of law, it is

ORDERED and ADJUDGED that

The co-debtor Gary J. MacDonald is hereby denied a discharge of his debts in this bankruptcy case.

The complaint is dismissed as against the co-debtor Christina F. MacDonald.

## JUDGMENT

The Court having issued separate findings of fact and rulings of law, it is

ORDERED and ADJUDGED that

The defendants, Earl MacDonald and Gary J. MacDonald, shall execute and deliver to the trustee in bankruptcy, Maurice M. Cahillane, an assignment in form reasonably satisfactory to the trustee transferring to the bankruptcy estate all legal and beneficial ownership of the 1000 shares of Class A Common stock of Spectrum Wire Corporation standing in the name of Earl MacDonald.

The trustee's claims against the defendants Greg MacDonald and Linda MacDonald are dismissed.