**In re R. Allen CHARNOCK, Debtor.**

**UNITED STATES of America, Plaintiff,**

**v.**

**Robert A. CHARNOCK, a/k/a R. Allen Charnock, et ux., et al., Defendant.**

**Bankruptcy No. 87–508–BKC–8P7.**

**Adv. No. 87–139.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Feb. 21, 1989.

Norman Davidson, Tampa, Fla., for Lawrence Kleinfeld, trustee, intervenor plaintiff.

Dennis Moore, Asst. U.S. Atty., for U.S.

Marika Lancaster, Washington, D.C., for Dept. of Justice–Tax Div.

James Robinson, for Southeast Bank.

Orrin Gowen, St. Petersburg, Fla., for Home Federal Bank.

Barnett Bank of Pinellas County, pro se.

Associated Marine Institutes, Inc., pro se.

Robert C. Kirch d/b/a Applied Telephone Tech., pro se.

Darryl R. Richards, Clearwater, Fla., for Robert P. Manderschied.

Harley Riedel, Tampa, Fla., for Robert Charnock.

B. Gray Gibbs, St. Petersburg, Fla., for Susan Charnock, Southshore Properties, Inc., Baytown Marina, Inc., Bayfront Holding Co., Inc., and BL & S, Inc.

Zala Forizs, St. Petersburg, Fla., for William Bennett.

Robert Soriano, Tampa, Fla., for Federal Deposit Ins. Corp. and Sharon Stock.

John Yanchunis, St. Petersburg, Fla., for Florida Nat. Bank.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS is a Chapter 7 liquidation case, initially instituted as a case under Chapter 11 of the Bankruptcy Code. The controversy under consideration presented by the above-captioned adversary proceeding instituted by the United States of America (Government) teaches a classic object lesson on the subject of how to live high on the hog for years and not pay any taxes. This was allegedly accomplished, according to the Government, by R. Allen Charnock (Debtor), one of the Defendants named in this adversary proceeding. It appears that the Debtor was apparently successful in accomplishing this in spite of the relentless pursuit by the Government, who, like Inspector of Police Javert, who also pursued Jean Valjean in the classic, *Les Miserables*, pursued this Debtor for almost a decade in

an attempt to collect delinquent taxes owed by the Debtor, so far without any notable success.

This present skirmish between the Debtor and the Government appears to be the last ditch attempt by the Government to impose a tax lien on morsels of assets, all of which, according to the Debtor, are not and never were his assets at all, but are either owned by corporations or by his non-debtor spouse, neither of which owes any taxes to the Government.

The issues which were tried at the final evidentiary hearing were presented by the Amended Complaint filed by the Government who sought a determination of the Debtor's interest in certain assets and for a determination of the validity, priority and extent of the Government's tax lien on those assets.

In Count I of the Complaint, the Government asserts a secured claim in the amount of $242,884.46, plus interest and statutory additions not specified, based on alleged nonpayment by this Debtor of income taxes for the tax years 1970, 1971, 1972, 1973, 1974, 1975, 1976 and 1977. Although the total of the assessed, unpaid taxes is only $175,330.67, the difference between the amount claimed as secured by the tax lien and this amount apparently represents interest and statutory additions according to law. In addition, the Government also asserts a transferee liability against the Debtor for the tax years 1974, 1975, 1976 and 1977 which relates to an alleged transfer of assets of a corporation known as the Harn Corporation. This claim is asserted in the amount of $57,043.71 plus interest and statutory additions. The Government also asserts a transferee liability against the Debtor concerning a transfer of assets of Arno International, Inc., for the years 1974 and 1975 in the amount of $5,548.22 plus interest and statutory additions. This is an alleged corporation income tax liability of Arno International. The Government also asserts a transferee liability in connection with a transfer of assets of Arno International against the Debtor for unpaid, withheld Federal Insurance Contribution Act Tax Liability (FICA) for the first quarter of 1971 up to and including the last quarter of the tax year 1973. This liability is alleged to be in the amount of $69,-430.81. Also in connection with Arno International, the Government asserts a transferee liability against the Debtor for Federal Unemployment Tax (FUTA) for the tax years 1971, 1972 and 1973 in the amount of $8,206.44, plus interest and statutory additions. The assessments, according to the Complaint, while made at different times, were all placed on the public records. On April 4, 1988, this Court entered an Order bifurcating the trial such that the threshold issue to be tried was whether the Debtor had any interest in certain properties upon which the Government asserts its liens for the above-alleged tax liabilities of the Debtor.

In connection with this threshold issue, the Government, in addition of naming the Debtor, also named as defendants Baytown Marina, Inc. (Baytown), as nominee, Associates Marine Institutes, Inc. (Associates) as nominee for Baytown, all alleged to be alter egos of the Debtor. William K. Bennett, a practicing attorney, is also named as defendant and alleged to be a nominee of the Debtor concerning certain real property located in Sevier County, Tennessee, and Susan Upchurch Charnock, the wife of the Debtor, as nominee of the Debtor, and Robert C. Kirch, d/b/a Applied Telephone Tech, Southeast Bank, N.A., and Barnett Bank of Pinellas County. While several of the Defendants no longer have any claims concerning any of the properties which are involved in this controversy, the evidence presented basically limited to a controversy between the Government, Susan Upchurch, Southshore Properties, Inc., American Marine Institutes, Inc., William K. Bennett and Robert P. Mandershied, the other Defendants named in the Complaint.

The properties involved in this controversy pursuant to Stipulation submitted by the parties are as follows:

1. Proceeds of the sale of the property, equipment and related facilities known as Baytown Marina, Inc., presently on deposit in the Registry

of the United States District Court for the Middle District of Florida

2. One 44–foot Gary Parks homemade fiberglass sport fishing vessel, model year 1979, serial number TNZG00260477, Fl number 7802EG, Title number 1021330

3. One 1983 Mercedes Benz 500 SEL 4–door Sedan, VIN: WDB12603712032088, Title number 40957098, with one NEC Model, Mobile Telephone

4. The sum of $6,400 on deposit in Park Bank in Account No. 071826 or about November 1, 1984, in the name of Southshore Properties, Inc.

5. A parcel of improved real property located in Sevier County, Tennessee

6. One 1983 Ford Bronco, VIN: 1FMEU15G3DLA77421

The facts as established at the final evidentiary hearing through oral testimony and documentary evidence relevant to the resolution of these issues are as follows:

### Bayfront Holding/Baytown Marina

The events leading up to the Debtor's involvement in the affairs of Bayfront Holding/Baytown Marina dates back to several years when the Debtor was involved with an unimproved real property located in Bradenton, Florida, known as Beach & Sun Motel. It appears that while the Debtor did not have any ownership interest in this property, he was instrumental in the sale of this property after it was converted into condominium project and received substantial compensation for his services. Utilizing the funds obtained from this transaction, on August 20, 1981, the Debtor acquired the controlling interest in a corporation known as Southshore Fuel Oil Co. (Southshore), together with one Mr. Malone. This transaction involved an investment by the Debtor of $84,500.00. Southshore was the owner of a large tract of valuable land located in Pinellas County, Florida, which was later developed by the Debtor as a marina after the corporation's name was changed to Baytown Marina, Inc. (Baytown).

On May 25, 1982, the Debtor transferred his 178 shares in Southshore to Malone, who, in turn, on October 5, 1982, transferred his shares to Mr. Lender and Mr. Bell. There is no indication in this record as to the actual consideration received by the Debtor for this transfer. During all this time, the marina was in the process of development under the control and supervision of the Debtor even though by this time stock ownership was ostensibly held by Lender and Bell. Sometime later, Lender and Bell transferred their shares to a newly formed corporation known as Bayfront Holding Co. (Bayfront Holding), which had been controlled by Bell. It appears that a person named Knudson, a friend of the Debtor, loaned $300,000.00 to Susan Charnock, the wife of the Debtor, who, in turn, purchased all outstanding shares in Bayfront Holding from Lender and Bell and pledged as collateral for this loan 50% of the newly acquired stock in Bayfront Holding. The stock, if it had any value at all, was certainly nominal, being stock in a closely held corporation whose business was at that time still in the embryonic stages of development. As the result of this transaction, Bayfront Holding became the sole stockholder of Baytown Marina. The net result of this convoluted and contrived and complex transaction was, of course, that Susan Charnock, the Debtor's wife, emerged as the sole stockholder of Bayfront Holding and, in turn, of course, Baytown Marina, even though it is clear that she did not invest any money whatsoever in either corporation, with the possible exception of $100, a proposition not without doubt. It is clear that the reason the transaction was structured in the fashion outlined was on the advice of counsel who advised the Debtor and his wife that in light of the large outstanding tax liability of the Debtor, everything should be placed in her name in order to prevent the Government from reaching the properties of Baytown Marina. While Susan Charnock claims to have visited the premises of the Marina at times, there is no question that she had absolutely no expertise in running a marina and during the time pertinent, she was active as a travel agent for Sun World

Tours and was also employed by a newspaper, an employment agency and at times as a secretary. This record leaves no doubt that Susan Charnock's involvement in the affairs of Baytown Marina was nil and the entire operation was under the sole supervision and control of the Debtor who made all decisions concerning the conduct of the affairs of Baytown Marina. This conclusion is fully supported not only by the undisputed facts just recited, but also by the media publicity concerning the development and operation of the Marina. For instance, this record is replete with evidence which clearly establishes that he held himself to the public as "the" man involved in the affairs of Baytown Marina (Plaintiff's Exh. 100c) In the February 4, 1984, issue of the *Tampa Tribune*, there was a feature article which described in glowing terms the plans of the Debtor who claimed to be the owner of the largest high and dry marina in Florida including a 75,000 square foot stntown St. Petersburg. According to the article which quotes the Debtor, the Debtor stated that he was interested in the project because he was a frustrated boater and could not find an adequate facility for the maintenance for his 22–foot boat. The *St. Petersburg Times* also carried an interview with a picture the Debtor describing him as the owner of Baytown high-and-dry Marina in St. Petersburg. According to the article, the property was for sale reportedly for $5.5 to $6 million. This article again described the Debtor as the owner who stated to the newspaper that he was in active negotiations for the sale of the marina (Plaintiff's Exh. 10b and 10c, respectively). A full-page ad placed in the *St. Petersburg Times* on October 16, 1983, Sunday edition, advertising the Baytown high-and-dry marina also features the Debtor as the owner. The article stated that the Debtor was a developer who acquired a last choice piece of property in the area and he, together with a friend, is building a high-and-dry marina. The article repeatedly refers to the marina as the property of the Debtor (Plaintiff's Exh. 10a). There is nothing in this record to support the proposition that he was inaccurately quoted in the article, or that the article describing him as the owner was inaccurate, or that the ad placed in the paper was not with his consent.

On October 11, '1984, the Government filed a suit in the United States District Court and sought to assert its properly recorded tax lien against the assets of Baytown Marina. Although it is not clear, it appears that all assets of Baytown Marina were liquidated during that litigation, and the proceeds derived from the liquidation placed in the registry of the District Court in the amount of $76,669.54 is one of the items involved in this present controversy.

*Gray–Parks Fishing Vessel*

It appears that Baytown Marina also became involved in a transaction relating to one of the items involved in this controversy which is one 1979 44–foot Gary Parks fiberglass sport fishing vessel. The transaction concerning the acquisition of this fishing vessel is even more complicated than the acquisition by Susan Charnock of an outstanding share in Bayfront Holding, which in turn owned all outstanding shares in Baytown Marina just discussed.

Associated Marine Institute, Inc. (Associated Marine), is a non-profit corporation primarily involved in training seamanship to underprivileged and delinquent children. Associated Marine at times receives vessels through donation from wealthy individuals who initially offered their boats for sale, but, having been approached by Associated Marine, agreed to make a charitable donation of the boat to Associated Marine in order to obtain tax benefits. It appears that Associated Marine acquired ownership of this fishing vessel in the manner just described and thereafter entered into a charter agreement with Baytown Marina, Inc., on February 18, 1983 (Plaintiff's Exh. No. 79). The charter was for a two-year term ending February 18, 1985. Pursuant to the charter, Baytown Marina was required to pay $850.00 for each month to Associated Marine during the term of the charter.

It appears that on December 10, 1984, Associated Marine sold the vessel to Baytown Marina—Robert Charnock for $40,-650.00, and on the same day an affidavit

for exemption was signed by R.C. Charnock indicating ownership of the fishing vessel was transferred from Associated Marine to "Baytown Marina—Robert A. Charnock" (Plaintiff's Exh. No. 85). The owner's address on the title certificate was stated to be 3980 Bellevista Drive, which, as noted earlier, is the residence of the Debtor and his wife. The title to the fishing vessel was later on transferred to Southshore and used as collateral for a loan obtained by Gold Card Travel Management, Inc., an entity also controlled by the Debtor. This loan is evidenced by a promissory note signed by the Debtor as president of Southshore (Plaintiff's Exh. No. 86). There is no question that the fishing vessel was at all times exclusively under the control of the Debtor, kept in back of his waterfront residence and Associated Marine no longer claims any ownership interest in this fishing vessel.

### Southshore Properties, Inc. (Southshore)

On December 8, 1982, the Debtor formed a corporation known as Southshore Properties, Inc. (Southshore), for the purpose of the acquisition of real properties. While it is intimated that the corporation was formed by Susan Charnock, this Court has little doubt that the principal actor in this affair was also the Debtor, even though Susan Charnock was named as president and sole stockholder of Southshore. Clearly, this transaction was also structured in order to immunize any assets to be acquired by Southshore from the tax lien asserted by the Government against the Debtor. There is no evidence in this record that Susan Charnock ever invested any money whatsoever in this corporation or paid anything for the corporation stock issued to her, if the stock certificates were even ever issued.

Susan Charnock was also an officer, director, and registered agent and sole stockholder of several different entities in addition to Southshore. There is hardly any doubt that Susan Charnock demonstrated total ignorance of the professed business purposes of these corporations and as to her official capacity and duties concerning the affairs of these corporations. For example, Transport Holding Company was one of the entities formed by the Debtor of which she was the president, secretary, treasurer, the sole director and registered agent. This corporation acquired an option to purchase a warehouse. It is uncontradicted that the Debtor told an undercover federal agent that he has controlling interest in that option and he has the ability to negotiate the sale of the warehouse even though nominally the ownership was placed in his wife's name.

Her non-involvement in the business of entities run by the Debtor is further indicated by her role played in the affairs of Southshore.

### 1983 Mercedes–Benz

On July 14, 1984, the Debtor placed an order for the purchase of a 1983 Mercedes–Benz automobile with Euro–Imports. It was a used vehicle which was to be imported from Germany. Upon arrival of the vehicle, the title was placed in the name of the Debtor. This acquisition was financed by Home Federal, and the original title certificate, (Plaintiff's Exh. No. 33), indicates a lien in favor of Home Federal. The check issued by Home Federal was made payable to the Debtor; however, the purchase order indicated the Buyer to be Southshore, and it was signed by the Debtor as president of Southshore (Government's Exh. No. 34). (?) The Debtor claims that it was signed by him only in his capacity as president. A close reading of the document failed to reveal any reference to the Debtor as president as the purchaser of the Mercedes–Benz. Be that as it may, the title of the Mercedes was later on amended to reflect that the automobile was owned by Southshore. There is no question that the vehicle was at all times and still is the personal vehicle used by the Debtor and his wife. The vehicle was ultimately seized by the Government and is still in storage pending the resolution of the question of ownership of the vehicle.

### Tennessee Summer Home

It appears that Southshore started without any capitalization whatsoever. Never-

theless, it progressed steadily due to the astuteness of the Debtor in acquiring several real properties without paying for same, such as a property located in the State of Tennessee.

It appears that sometime in 1984, the Debtor and his wife, frequent visitors to Tennessee, came across a property in which they became interested and decided to acquire it to be used by them as a summer home. After having visited a real estate office in Sevier County, Tennessee, they entered into an Agreement with one Mr. Howard for the purchase of this property (Government's Exh. No. 91). The Agreement to Purchase was executed on October 22, 1984, and named Southshore Properties, Inc., as the buyer and David Howard as the seller. The Agreement was signed by the seller, David Howard, and also written in the signature line was Southshore Property, Inc., by R.C. Charnock. The Agreement called for a closing on or before June 15, 1985, and required the payment of the purchase price in the amount of $55,000.00. Pursuant to the Agreement, Southshore was to make a deposit of $1,000.00 upon execution of the contract and an additional deposit of $9,000.00 on or before November 23, 1984, and an additional $10,000.00 on or before December 21, 1984. The original deposit was paid by Southshore with a check No. 524 drawn on the account of Southshore Properties, Inc., signed by R.C. Charnock (Government Exh. No. 104). It further appears that on October 22, 1984, an additional $5,000.00 was paid to the seller, David Howard, by Check No. 556 of Southshore's, this check also signed by R.C. Charnock.

It appears that at the time relevant to this transaction, Mr. Bennett, one of the Defendants named in the Complaint, a practicing attorney, was a tenant in property owned by Southshore and at times represented the Debtor and/or Southshore. It further appears, however, that albeit there is no check in evidence, it appears that Southshore paid an additional $10,000.00 for a total of $16,000.00 toward the purchase of the property. When the time arrived to close the contract to purchase the Tennessee property, Southshore did not have the funds to make the payment. In order to save the contract to purchase, the Debtor entered into an agreement on behalf of Southshore as its president with Mr. Bennett. The Agreement executed on April 18, 1985 (Plaintiff's Exh. No. 93), assigned Southshore's rights in the contract to purchase the Tennessee property to Mr. Bennett, who in turn agreed to obtain the funds necessary to save the contract. On April 18, 1985, Bennett, in fact, through Home Federal Bank of Florida, an institutional lender, borrowed $41,045.12 in order to make the payment which became due at closing. According to the Agreement, the title to the property was to be placed in the name of Mr. Bennett with the proviso that Mr. Bennett will reconvey the property to Southshore by quit claim deed when all liabilities of Bennett as they related to this transaction have been satisfied by Southshore. The Agreement also granted a security interest to Bennett in all the furniture, fixtures and furnishings in the offices leased by Mr. Bennett which were owned by Southshore. There is hardly any question that it was never intended that Bennett ever will become the owner of this property. Again, the transaction was structured solely for the purpose first of insuring that the right of Southshore to purchase the property was not lost, and second, that the property will be immune from the tax lien claimed by the Government. It is evident that Bennett was merely a nominee or a conduit to achieve this goal. It is without dispute that Bennett was fully aware of the Debtor's tax problems. The transaction between Howard and Bennett, the newly named assignee of the contract, was concluded by the execution of a warranty deed by Howard to Bennett (Exhibit No. 94), at which time Mr. Bennett paid $41,200.00 to Howard, the balance of the purchase price. There is no question that Mr. Bennett never intended to use his own funds and it was fully understood that the monies will be borrowed funds by Mr. Bennett, which, upon the conclusion of the sale would be repaid to the lender, Home Federal Savings & Loan Association (Home Federal). It ap-

pears when the loan obtained from Home Federal became due, that Bennett did not have the funds necessary to repay on the loan, having received only $12,000.00 from the Debtor (Tr. 467) at that time which he paid over to the Bank (Plaintiff's Exh. 97). Since the original due date passed, Home Federal agreed to extend the due date of the note. Bennett did execute a new note which carried the new due date agreed upon by Home Federal (Plaintiff's Exh. No. 46).

It further appears that when the extended due date arrived and Bennett was required to pay the monies borrowed from Home Federal in full, Southshore again did not have the funds to pay the funds to Bennett in order to enable him to meet his obligation to Home Federal. As the result, the position of Bennett appeared to become precarious, and, not only the loss of the right to purchase the property became a reality, but also his exposure to a suit in the note by Home Federal. It appears, however, that a friend of the Debtor, Robert Manderschied (Manderschied), who has known the Debtor for more than fifteen years, came to the Debtor's rescue and furnished the funds needed to close the transaction. According to the disbursement made at the closing relating to this transaction (Plaintiff's Exh. No. 109), the money borrowed from Manderschied was disbursed as follows:

| | |
|---|---|
| Proceeds from Bank Loan | $45,000.00 |
| Less: | |
| Disbursements per instructions | 39,572.52 |
| Recording fees: warranty deed | 136.50 |
| deed of trust | 57.50 |
| Insurance Premium | 498.00 |
| Federal Express | 52.75 |
| Title work and Attorney Fees | 850.00 |
| | $41,167.27 |
| NET CHECK to Philip Nemeth | 3,832.73 |
| Manderschied, Robert—purchase from Bennett | $10,000.00 |
| Disbursement per instructions | |
| NET CHECK to Joseph Magnani | $10,000.00 |

The reference to "disbursement per instructions ..." the sum of $10,000.00 to Joseph Magnani is unclear. He is not identified in more detail, although it is fair to assume that he was a representative of the Seller of the property, Mr. Howard.

In sum, the property which originally was to be purchased ostensibly by Southshore, and the contact to purchase was assigned to Bennett who borrowed funds to save the contract, ultimately ended up to be a property at least on the record of Manderschied. It is undisputed that the Tennessee property has been used at all times since the purchase, and is still being used by the Charnocks as their summer home.

### Ford Bronco

But this was not the end of Manderschied's involvement with the affairs of the Debtor. He also became the owner of a 1983 Ford Bronco previously owned and still used by the Debtor. Although the title to the Bronco is in the name of Manderschied at this time, the owner's address on the title certificate was stated 3980 Bellevista Drive, St. Petersburg, Florida, the residence of the Debtor, which was never the residence of Manderschied who resides on Captiva Drive, Lee County, Florida. This transaction, just like the Tennessee transaction, was again obviously structured in order to assure that the record owner of the Bronco was not the Debtor, but Manderschied, so that the Government will not be in a position to seize the Bronco pursuant to its tax lien asserted against the Debtor. It appears the Debtor asked Manderschied for a loan of $7,500.00; that Manderschied agreed to borrow this money from his bank; the loan was granted, secured by a lien on the Bronco; that the title was placed, as noted earlier, in the name of Manderschied. There is no question that Manderschied ever intended to buy or to use the Bronco which was consistently used by the Debtor and was kept either at his residence in Pinellas County or at the Tennessee property. The evidence further reveals that Manderschied was also fully aware of the Debtor's tax problems.

### Funds on Deposit

The last item in controversy is $6,400.00 which was on deposit in Park Bank of Florida in Account No. 071826. On or about November 1, 1984, the account was maintained by Southshore Properties and

although it is not clear, these funds were held by Chase Bank, the successor in interest of Park Bank, which was liquidated by the FDIC which at the time of the commencement of the case were all dissipated, thus no longer involved in the present controversy.

*Conclusions of Law*

■ It is a universally accepted proposition that a corporation is a legal entity existing separate and apart from the persons, that is, the individuals which make up its ownership. This is a legal theory which has been introduced for the purpose of convenience and to subserve the ends of justice. Nevertheless, it is equally clear that in an appropriate case in furtherance of the ends of justice, a corporation and an individual or individuals primarily who own all its stock will be treated as the alter ego of the corporate entity and the separateness of the corporation will be disregarded where it is used as a cloak to cover fraud or illegal conduct. *R.J. Paquette Aviation Enterprise, Inc. v. C.B. Phillips, Inc.,* 262 So.2d 229 (Fla.1970); *Plank v. Arban,* 241 So.2d 198 (Fla.1970); *St. Petersburg Sheraton Corp. v. Stuart,* 242 So.2d 185 (Fla. 1970); *P & P Paint & Body Shop, Inc. v. Ed Skoda Ford, Inc.,* 315 So.2d 179 (Fla. 1975); *Armour & Co. v. B.F. Bailey, Inc.,* 132 F.2d 386 (5th Cir.1942); *Fontainbleau Hotel Corp. v. Crossman,* 323 F.2d 937 (5th Cir.1963). Courts are generally reluctant to pierce the corporate veil (*State ex rel. Continental Distilling Sales Co. v. Vocelle,* 27 So.2d 728 (Fla.1946), superseded on other grounds by statute as stated in *Division of Beverage of State, Dept. of Business Regulation v. Foremost–McKesson, Inc.,* 330 So.2d 143 (1976), when a corporation is formed for the purpose to accomplish fraud or other illegal acts. Courts are more reluctant to disregard the separate and distinct existence of a legal entity and the acts of the real parties will be dealt with as though no corporation has ever been formed (*Riesen v. Maryland Casualty Co.,* 14 So.2d 197 (Fla.1943); *Marks v. Green,* 122 So.2d 491 (Fla.1960). Thus, courts will not hesitate to pierce the veil of the corporate fiction when it is shown that a corporation was organized and being used by an individual either to avoid personal liability or to immunize his individually owned assets from the reach of legitimate creditors. Thus, when it is established that the corporate fiction was merely an alter ego or a mere conduit of an individual used to achieve improper results, the corporation fiction will be disregarded in the interest of securing a just determination of the act *Alkire v. NLRB,* 716 F.2d 1014 (4th Cir.1983); *United States v. Creel,* 711 F.2d 575 (5th Cir.1983); *Gartner v. Snyder* 607 F.2d 582 (2nd Cir.1979); *Federal Deposit Ins. Corp. v. Allen,* 584 F.Supp. 386 (E.D.Tenn.1984).

■ Applying the foregoing general principles to the specific facts established in this case, it should be noted at the outset that this is not a case which involves an attempt by a creditor to hold an officer, director or stockholder of a corporation personally liable for corporate debt. This is clear from this record because it is without dispute that the Debtor was never a stockholder, director or officer of either Bayfront Holding, Baytown Marina or Southshore Properties. The attempt of the Government to reach the properties which are ostensibly owned by these entities must, therefore, establish first that these corporations were formed for the purpose of enabling the Debtor to engage extensively in business without facially owning any properties which the Government could reach to satisfy the outstanding liabilities, and second, that the Debtor did, in fact, exercise such a persuasive domain and control over the assets of these entities that they were in fact his, and therefore subject to the tax lien securing an unpaid tax liability of this Debtor. This is precisely the position taken by the Government who, relying on the old adage that if it walks like a duck, quacks like a duck, and looks like a duck, it has got to be a duck. There is hardly any question that the ostensible sole stockholder of Bayfront Holding and Southshore Susan Charnock, the Debtor's wife, invested no funds whatsoever these entities and in effect had absolutely nothing to do with running the affairs of those

entities or making any decisions concerning the conduct of their businesses. While there is evidence in this record that she allegedly paid $100.00 for the stock of Bayfront Holding, stock which was pledged to secure a $300,000.00 indebtedness, a proposition by itself which sounds incredible, as a matter of economics, the fact remains that these corporations were formed for the purpose of shielding any assets which might be acquired and later owned by these two entities. Equally, there is hardly any doubt that the Debtor himself repeatedly held himself out to the public in general that he was the "owner" of Baytown Marina and he is the dominant force in developing the marina and it is *his* marina. As noted earlier, statements made by him in the newspaper clearly belie any later protestation by the Debtor that he was merely nothing but an employee of Baytown Marina who worked without receiving any salary. One of the most telling aspects of this case is, of course, the statement by the Debtor in conjunction with a negotiation to sell an option to a warehouse owned by another entity controlled by him when he stated that he owns the warehouse or the option to sell the warehouse, a statement made to an undercover agent of the Government. From the foregoing, it is clear that whatever assets remaining, ostensibly owned by Bayfront Holding/Baytown Marina, were in fact his and, therefore, subject to whatever tax lien the Government has perfected against those assets. This includes not only the proceeds from the sale of the property, equipment and related facilities, proceeds presently on deposit, but also the 44–foot Gray–Parks fiberglass sport fishing vessel and the 1983 Mercedes–Benz. The Debtor's contention that there is no proof here that the Debtor invested anything in Bayfront Holding or Baytown Marina is a non sequitur. The fact of the matter is neither did Susan Charnock, his wife, with the exception of the alleged $100.00 investment. The controlling facts are the exercise and dominion control over the assets and affairs of these entities and the total lack of involvement in the affairs by the president and sole stockholder Susan Charnock. The fact that when the entities were formed, the Debtor knew that he must shield his assets, otherwise they will be subjected to a tax claim of the Government. Lastly, the actual conduct of the Debtor, vis-a-vis these assets which were repeatedly and consistently held out to the public at large that the assets are in fact owned by him and he is in the sole control of these two entities.

The picture is not much different concerning Southshore Properties, which again was a corporation formed by him, again although ostensibly by his wife, on the advice of counsel for the express purpose again to assure that any properties which may be acquired by Southshore will not be reached by the Government. Southshore had no capitalization whatsoever. The involvement in the affairs of Southshore of Susan Charnock, the ostensible sole stockholder and president, was nil. Southshore was expressly formed for the purpose of isolating the assets and whatever assets were required by Southshore such as the Tennessee summer home obviously have been and at all times were intended to be the property of the Debtor regardless of the web of technicalities which were formed around the transaction. There is no question that Mr. Bennett, the first titular title holder never intended to purchase the property, never lived in the property and merely lent his credit to enable the Debtor to purchase the property. Neither did Mr. Manderschied, who ultimately acquired legal title to the property who again never intended to use it, to rent it or exercise any indicia of ownership over the property. The most that could be said was that he also lent the funds necessary to enable the loan to Mr. Bennett to be repaid, which in turn enabled Mr. Bennett to repay the loan he obtained from Home Federal. The legal position of Mr. Bennett and/or Mr. Manderschied is somewhat complex since ostensibly both of them were legal title owners of the Tennessee property. However, under this record, it is fair to conclude, a proposition well supported by case law, the title taken by way of security is deemed to be a mortgage interest even though the mortgagee ostensibly is named

as the legal owner of the property. *Rosenthal v. Le May,* 72 So.2d 289 (Fla.1954).

■ This leaves for consideration the Ford Bronco and the funds on deposit. A transaction relating to this vehicle was obviously structured again to assure that the record owner was not the Debtor so as not to permit the Government to seize the Bronco to enforce its tax claim. This relationship was that of a borrower-lender relationship and clearly was to enable the Debtor to purchase the vehicle. Just like the summer home, there is no question that the Debtor has an unfettered control and use of the vehicle. The title certificate indicates the Debtor's address as the address of the owner even though it is clear that Manderschied never lived at that address. It is clear from the foregoing that the interest of Manderschied, if any, would be limited to a lien interest, if that could be established, securing the debt owed by the Debtor incurred by Manderschied in conjunction with the purchase of the Ford Bronco.

Since as noted earlier, the funds originally on deposit in the Park Bank and ultimately held by Chase Bank have fully dissipated, these funds are no longer involved in the present controversy.

Based on the foregoing, this Court is constrained to conclude that notwithstanding the ostensible separateness of the entities involved in this controversy, that is, Bayfront Holding, Baytown Marina and Southshore Properties, the Debtor Charnock was in fact an alter ego of these legal entities, and for reasons stated earlier all assets of these entities were in fact the assets of this Debtor subject, of course, to all valid reason and common sense. In this connection, this Court is further satisfied that the interest of Bennett and Manderschied in the Tennessee property was the interest of a mortgagee in spite of the fact that facially Bennett was and Manderschied is currently the record owner of the Tennessee property. The same proposition is equally applicable to the Ford Bronco which, although titled in the name of Manderschied is, in fact, the property of the Debtor, subject to a lien interest of Man-

derschied. This shall not be construed to be a determination of the respecting priorities of the competing liens, i.e., the lien position of the United States of America versus lien claim of Bennett and/or the lien claim of Manderschied in the properties involved.

In order to facilitate the final resolution of the remaining issues, a Pre-trial Conference shall be held before the undersigned on March 7, 1989, at 4:15 p.m.