**In re Gary J. MacDONALD, Debtor/Appellant.**

**Civ. A. No. 89–30179–F.**[1]

United States District Court, D. Massachusetts.

May 3, 1990.

---

1. On motion of appellants Gary J. MacDonald and Earl MacDonald, this case was consolidated with Civil Action Nos. 89–30181–F and 89–30182–F on September 15, 1989.

Joseph H. Reinhardt, Hendel, Collins & Newton, Springfield, Mass., Darragh K. Kasakoff, Seder & Chandler, Worcester, Mass., for appellants.

Maurice M. Cahillane Egan, Flanagan & Egan, Springfield, Mass., Trustee.

## MEMORANDUM AND ORDER

FREEDMAN, Chief Judge.

### I. INTRODUCTION

Before the Court is an appeal by Gary J. MacDonald and Earl MacDonald ("the appellants") of a holding in United States Bankruptcy Court for the District of Massachusetts, in which the bankruptcy court held in favor of the trustee in bankruptcy, Maurice M. Cahillane ("the trustee").

At issue is ownership of the controlling block of shares in Spectrum Wire Corporation ("Spectrum Wire"), a corporation operated by Gary J. MacDonald ("the debtor"). Although this stock was issued to Earl MacDonald ("the debtor's father"), the bankruptcy court construed state trust law and found that the stock was actually held in trust for the debtor, that the debtor held a beneficial interest in the stock, and that the stock belonged in the debtor's estate. Therefore, the bankruptcy court held that the stock should be turned over to the trustee pursuant to 11 U.S.C. § 542(a). Further, the bankruptcy court held that the debtor had concealed his beneficial interest in the stock, with the intent to hinder, delay or defraud his creditors within the meaning of 11 U.S.C. § 727(a)(2) and therefore was not entitled to a discharge in bankruptcy.

*In Re MacDonald,* 101 B.R. 836, 844 (Bankr.D.Mass.1989).

The appellants now argue that the bankruptcy court made errors of law and fact in reaching its decisions to deny the debtor's discharge in bankruptcy and to order the turnover to the trustee of corporate stock held in the name of Earl MacDonald. The appellants urge this Court to reverse the bankruptcy court's judgments, and have asked the Court to schedule oral argument. The trustee argues that this Court should affirm the bankruptcy court decision. Both the appellants and the trustee have filed motions seeking to designate additional items for the record on appeal.

### II. FACTS

The events leading to the debtor's bankruptcy petition began in late 1984, when the debtor:

purchased all of the capital stock of State Wire & Cable Corp. ("State Wire") in a $2.4 million leveraged buyout in which he and his wife took joint title to 100 of the [State Wire] corporation's outstanding shares and State Wire redeemed the remaining 900 shares. The sale was made largely on credit through promissory notes payable to the selling stockholders, William and Charlotte Ford (the "Fords"); payment of State Wire's note was guaranteed by the Debtor. He thereafter devoted most of his time to the management of State Wire, serving as its president.... His father, Earl MacDonald, had retired in 1979 ... [and] held no office in State Wire, but worked for it on a part-time basis taking care of the grounds and performing errands. Bay Bank Valley Trust Company ("Bay Bank") was the corporation's principal lender under a revolving loan arrangement guaranteed by the Debtor and granting Bay Bank a security interest in State Wire's equipment, inventory, receivables and other property. Bay Bank also held a mortgage on the corporation's plant owned by the Debtor through a trust....

Defaults arose under the obligations owed Bay Bank and the Fords. In De-

cember of 1985, just a year after the purchase, State Wire was forced to accede to Bay Bank's security rights by surrendering possession of all its assets to the bank in lieu of an involuntary foreclosure. Spectrum played a role in this arrangement. On December 19, 1985 articles of organization were signed incorporating Spectrum and naming Earl MacDonald, the Debtor's father, as its president, treasurer, clerk and sole director. The only stock issued at that time was 120 shares of Class A voting stock issued to the father. Spectrum and Bay Bank entered into an arrangement whereby Spectrum agreed to act as the bank's foreclosure agent to complete work in process and pending contracts, and to wind down all of State Wire's operations.

By March of 1986 Spectrum's role as the bank's foreclosure agent was largely completed. Spectrum then commenced its own wire manufacturing operations, using the same plant owned by the Debtor and the equipment which the bank had repossessed. Spectrum paid rent of the equipment to Bay Bank and rent on the real estate to the Debtor through making the monthly payments due Bay Bank under his mortgage. The sum of $198,800 was obtained from the Debtor's father, Earl MacDonald, who advanced that amount in March 1986 as a loan, having paid $1,200 the previous December for 120 shares of stock. Of the total $200,000, $37,500 was treated as a capital contribution for which 1000 shares of Class A voting stock were issued, and $162,500 was treated as a loan. In April of 1986 the Debtor's brother Greg furnished $70,000 to Spectrum, receiving 100 shares of Class A voting stock for a $16,250 capital contribution and a note for the balance of the funds. These were the only shares issued, and they remain outstanding. Spectrum prospered, concentrating on sales of profitable thermostat wire and telephone wire. The Debtor directed its operations, as he had previously directed those of State Wire, and his father continued to perform the same type of odd jobs on a

part-time basis that he had performed for State Wire. On September 26, 1986 the Debtor replaced his father as president, and the Debtor's mother replaced his father as treasurer....

On December 30, 1986 an agreement was reached among Bay Bank, State Wire, Spectrum and the Debtor whereby (i) Bay Bank sold the surrendered equipment and the remaining surrendered inventory to Spectrum, (ii) the debtor released Bay Bank of a lender liability claim which he had been espousing, (iii) the Debtor gave Bay Bank a $90,000 note secured by a mortgage on his home, and (iv) Bay Bank released the Debtor from a potential deficiency liability of some $500,000 under his guaranty of State Wire's indebtedness. The Debtor remained liable to the Fords under his guaranty of payment of the purchase price for their capital stock of State Wire. The Fords sued him for $1 million, obtaining an attachment on his home. On July 6, 1987 the Debtor and his wife filed a joint petition in this Court requesting a discharge of their debts under Chapter 7 of the Bankruptcy Code. Their schedules filed with the petition listed no ownership interest in Spectrum.

*In re MacDonald,* 101 B.R. at 838–39.

So, while Bay Bank has released the debtor from personal liability for any deficiency in repayment of bank loans to State Wire, the debtor still owes approximately $385,000 to the Fords under the personal obligation he undertook when he took control of State Wire through the so-called "leveraged buyout." Transcript III at 14; Appellants' Brief at 7. The facts of the case chart the debtor's movement through a series of corporate shells which evolved from his shifting business interests and ideas. These facts will be referred to and expanded upon in the Court's dissection and discussion of the legal issues in the case.

The debtor's father is asking this Court to protect his controlling stock interest in Spectrum Wire, the corporation that arose from the assets of State Wire following a series of transactions engineered by the

debtor and his bankers. Spectrum Wire owns a 50,000 square foot building which it rents to a new corporation formed by the debtor. The debtor's father argues that he obtained the building and other Spectrum assets by virtue of a $37,500 stock investment in Spectrum.

The debtor is asking this Court to grant him a discharge from his debt to the Fords and all his other creditors.

## III.  DISCUSSION

█ This Court is obligated to conduct a *de novo* review of questions of law. *The Bible Speaks v. Dovydenas*, 81 B.R. 750, 754 (Bankr.D.Mass.1988), *citing Molerio v. Federal Bureau of Investigation*, 749 F.2d 815, 820 (D.C.Cir.1984). The appellants in the case at bar have challenged the bankruptcy court's interpretation of state trust law as applied to two subsections of the Bankruptcy Code. Therefore, this Court must conduct a *de novo* review of the bankruptcy court's findings of law which led to its denial of the debtor's discharge from bankruptcy and its order that the debtor's father turn over his Spectrum Wire stock to the bankruptcy trustee.

Under the federal Bankruptcy Code, the bankruptcy trustee is entitled to use, sell or lease any "property of the estate." 11 U.S.C. § 363(b)(1). "Property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). It is "necessary to look to nonbankruptcy law, usually state law, to determine whether the debtor has any legal or equitable interest in any particular item." 4 *Collier on Bankruptcy*, ¶ 541.02[1] at 541–13 (15th ed. 1989). Since "property interests are created and defined by state law," such interests are analyzed under state law in bankruptcy proceedings unless "some federal interest requires a different result." *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). *See also In re Prichard Plaza Associates Ltd. Partnership*, 84 B.R. 289, 293 (Bankr.D.Mass.1988). This Court's resolution of the dispute over the debtor's interest in Spectrum Wire is grounded in state corporations law, and takes into account the equitable powers of the bankruptcy court. However, in light of the bankruptcy court decision under review, this Court's analysis of the appellants' ownership interest in the Spectrum Wire stock must begin with a discussion of the Massachusetts law of trusts.

### A.  Stock as the Subject Matter of an Express Trust

The bankruptcy court found that conduct and verbal agreements by the debtor's father "manifested an intention to hold in trust for the Debtor the shares of Spectrum stock standing in the father's name." *In re MacDonald*, 101 B.R. at 841. This conclusion, that an express trust was created by the debtor's father, is essential to the bankruptcy court's further holdings regarding the bankruptcy code's turnover and discharge provisions, and is therefore the main target of the appellants' brief.

> In order to create a trust:
> [n]othing more than the manifestation of intention to create such a trust is necessary, unless the subject matter of the trust is an interest in land, in which case a writing is required by the Statute of Frauds, or unless the disposition is in substance a testamentary disposition, in which case it is necessary to comply with the formalities required by the Statute of Wills.

Scott & Fratcher, *The Law of Trusts*, § 17.1 at 227 (4th ed. 1987) (footnotes omitted). In the case at bar, the trust is inter vivos and the subject matter of the trust is personal property. Therefore, the formalities and writings required for trusts in land or testamentary trusts do not apply. "No particular form of words or conduct is necessary for the manifestation of intention to create a trust." Scott, *The Law of Trusts*, § 24 at 192 (3rd ed. 1967). The question is whether the debtor's father, as settlor of the trust:

> manifested an intention to create the kind of relationship which to lawyers is known as a trust, that is to say, whether the settlor manifested an intention to impose upon himself or upon a trans-

feree of the property equitable duties to deal with the property for the benefit of another person.

*Id.* In the case at bar, the debtor's father denies any intention to create a trust and argues that he merely purchased a controlling interest in Spectrum Wire stock. The debtor's father was designated the sole director, corporate president, treasurer and clerk; later he surrendered the presidency and treasurership but remained as a director and corporate clerk.

Under the bankruptcy court's analysis, the debtor's father retained legal ownership of the Spectrum Wire stock, and held the stock in trust for the debtor. *In re MacDonald*, 101 B.R. at 840. Thus, the debtor was allowed to enjoy the beneficial ownership of Spectrum by managing its day-to-day operations and awarding himself a lavish salary and benefits, and by using corporate income to pay down the debtor's personal indebtedness.

The debtor's father remained the legal owner named on the stock certificates from the date of purchase, with physical possession in the hands of the corporation. The cases cited by the bankruptcy court in support of its theory of express trust creation involve either the physical transfer of the personalty at issue to the beneficiary or to another person, or the naming of the beneficiaries on stock or deposit certificates. *In re MacDonald*, 101 B.R. at 840–41. There was no such transfer or change in named ownership evidenced in the instant case.

The trustee argues that transfer of the trust property is not needed to create a trust, and that the debtor's father himself could serve as trustee of the trust property. Brief of Appellee at 11. To support this argument the bankruptcy trustee cites *Bourgeois v. Hurley*, 8 Mass.App.Ct. 213, 218, 392 N.E.2d 1061, 1065 (1979). However, the full opinion expressed in *Bourgeois v. Hurley* is instructive, in that it discusses a standard for courts which are looking for an expression of a settlor's intent to establish a trust. The *Bourgeois* court stated that "one may create a trust in securities standing in one's name by a sim-

ple declaration to that effect, without the necessity of any further act of transfer or delivery." *Id., citing Rock v. Rock*, 309 Mass. 44, 47, 33 N.E.2d 973 (1941). In the instant case, there is no evidence of any declaration by the debtor's father that a trust was intended. The stock certificates and testimony in this case do not document even a vague or ambiguous expression of intent to create a trust which might be elucidated by extrinsic evidence. Additionally, the Massachusetts Supreme Judicial Court has emphasized that while an express trust in personal property may be proved by parol evidence, any words used to prove such a trust "must unequivocally show an intention that the legal estate be vested in one person to be held in some manner or for some purpose on behalf of another." *Cooney v. Montana*, 347 Mass. 29, 35, 196 N.E.2d 202, 206 (1964). The bankruptcy court's reliance on inferences gleaned from the conduct of the debtor's father, standing alone without any spoken declaration or written documentation, cannot satisfy the requirements for creation of a trust.

In arguing that the debtor's father never manifested any intent to create a trust, the appellants state that the record contains no proof of a verbal agreement to create a trust. Reply Brief of Appellants at 5–6. Massachusetts cases have established a rule that to create an informal voluntary trust, the settlor must give notice to the beneficiary or "to some person in his behalf, and at least implied acceptance by the [beneficiary], in order to perfect the creation of the trust." *Mikshis v. Palionis*, 345 Mass. 316, 318, 187 N.E.2d 147 (1963), *quoting O'Hara v. O'Hara*, 291 Mass. 75, 78, 195 N.E. 909 (1935); *see also* 14A Simpson and Alperin, *Massachusetts Practice: Summary of Basic Law*, § 2044 at 382 (1974). In the instant case, it is possible to view the evidence as supporting the theory that the debtor, as the supposed beneficiary of the trust, was notified by the conduct of his father of his father's intent to bestow the debtor with the beneficial ownership of the company. However, there is no evidence of a spoken declaration, or documentation to support the use

of the trust creation theory. It is the opinion of this Court that the evidence also supports the inference that the debtor's father intended to make a loan which might help his son make good on a difficult financial situation.

The appellants also argue that the bankruptcy court did not follow Massachusetts case law, since it failed to consider Section 25 of the Restatement of the Law of Trusts. Section 25, which is cited in *Cooney v. Montana, supra*, states that "[n]o trust is created unless the settlor manifests an intention to impose enforceable duties." Enforceable duties are defined by the Restatement as "duties which are enforceable in the courts." Restatement (Second) of the Law of Trusts § 25, comment a. The facts in the instant case indicate no such enforceable duties were imposed by the debtor's father.

The trustee argues that section 25 of the Restatement is not applicable to the case at bar, since it concerns only disputes over the interpretation of the verbal expressions of a settlor who may have intended only a moral obligation rather than a legal duty enforceable by the beneficiary of a trust. The trustee states that the debtor was benefitted by his father's purchase and legal ownership of Spectrum stock, and the debtor's father was not even aware of the ownership of the stock, and therefore the section 25 requirement is not relevant. Brief of Appellee at 14. The Court is not convinced that the section 25 requirement of enforceable duties does not further detract from the trust creation theory. Without further torturing the meaning and significance of section 25, and the law of trusts, this Court finds a lack of evidence to support the theory that the debtor's father intended that his stock be held in trust.

### B. Piercing the Corporate Veil to Establish Debtor as Equitable Owner of Spectrum Stock

While this Court does not find that the debtor's father created an express trust, the Court does agree with the bankruptcy court's conclusion that the debtor does hold a beneficial interest in the controlling block of Spectrum Wire stock which was ostensibly owned by the debtor's father. The debtor's beneficial ownership of the stock is revealed by the piercing of Spectrum Wire's corporate veil.

Facts similar to the instant case were confronted in the case of *In re Daily*, 107 B.R. 996 (D.Haw.1989), in which debtor Sammy G. Daily controlled three corporate entities which were legally owned by his son, wife and daughter. *Id.* at 999. The district court affirmed the bankruptcy court's finding that despite the stock ownership held by other family members, the corporate entities were Sammy Daily's alter egos, and therefore the court properly attributed corporate stock to his bankruptcy estate since "transfers or use of the corporate facade [had] been employed as a means of prejudicing creditors or perpetuating injustice." *Id.* at 1009, *citing In re Landbank Equity Corp.*, 83 B.R. 362 (E.D. Va.1987) (corporate veil pierced in order to reach assets transferred to debtor's family members); *In re Charnock*, 97 B.R. 619 (Bankr.M.D.Fla.1989) (debtor, who held no stock himself, was alter ego of corporations legally owned by family members); *In re Tureaud*, 45 B.R. 658 (Bankr.N.D. Okla.1985) (piercing corporate veil of entities which the debtor dominated and controlled); *In re 1438 Meridian Place, N.W. Inc.*, 15 B.R. 89 (Bankr.D.D.C.1981) (piercing corporate veil of corporations which held debtors' assets).

The *Daily* court began its analysis by reasoning that a bankruptcy court's equitable powers enabled it to pierce the corporate veil in order to attribute assets or liabilities to the shareholders of a corporation. However, the court immediately recognized that a more difficult question is raised in cases where the bankruptcy trustee attempts to attribute assets of a corporation to a debtor "who is not a shareholder of the corporation concerned." *Id.* at 1006. The problem in *Daily*, as in the instant case of Gary MacDonald, "lies in the fact that [the debtor] was not a shareholder" of the corporations which the bankruptcy trustee seeks to bring into the debtor's estate. *Id.* at 1008. The *Daily* court found that state corporation law, as well as

the federal bankruptcy court cases, supported the decision to attribute "property to nonowners in order to prevent injustice." *Id.* at 1007. Likewise, the decision in the instant case to attribute ownership of the Spectrum Wire stock to the debtor was made in order to prevent injustice to the debtor's creditors.

As stated at the outset of this discussion, state law determines the nature and extent of the property interests held by the debtor and his father. Massachusetts courts will not pierce the corporate veil unless the "corporate form is used to inflict gross inequity, injury, or fraud." *Horizon House–Microwave, Inc. v. Bazzy,* 21 Mass. App. 190, 198, 486 N.E.2d 70, 75 (1985). *See also In re Ipswich Bituminous Concrete Products, Inc.,* 79 B.R. 511, 520 (Bankr.D.Mass.1987) (Massachusetts courts disinclined "to pierce the corporate veil absent elements of injustice or fundamental unfairness"); *In re WJM, Inc.,* 65 B.R. 531, 540 (Bankr.D.Mass.1986), *quoting My Bread Baking Co. v. Cumberland Farms, Inc.,* 353 Mass. 614, 619, 233 N.E.2d 748, 751–52 (1968) (discussing "circumstances in which one corporation, or person controlling it, may become liable for" another corporation's acts or torts). The legal standard established by the Supreme Judicial Court in *My Bread Baking Co.* allows the corporate veil to be pierced (a) when representatives of one corporation exercise "pervasive control" over another corporation and "fraudulent or injurious consequences" result, and (b) when corporations disregard their separate nature or when corporation and their representatives create serious ambiguity about the capacity in which they are acting. *My Bread Baking Co.,* 353 Mass. at 619, 233 N.E.2d at 752. In the instant case, the debtor used his personal resources to swing the deal which created the Spectrum Wire corporation, thus relieving him of financial liabilities for which he was personally responsible.[2] The debtor exercised complete control over Spectrum Wire, and drew a generous salary from the corporation, which was in reality his alter ego.[3] The debtor listed the claims of corporate creditors on his personal bankruptcy filing, and he acknowledged the likelihood that the corporate veils of the corporate entities he created could be pierced. Brief of the Appellants at 3 n. 3. While Earl MacDonald was listed as legal owner of a majority of the Spectrum Wire stock, the evidence indicates that most of the funds designated as Earl MacDonald's capital contribution for stock were originally in-

---

**2.** The debtor testified that Spectrum Wire was created to liquidate the assets of State Wire which the debtor had turned over to Bay Bank. The proceeds of this liquidation were turned over to Bay Bank. Transcript of Bankruptcy Court Hearing of May 2, 1989 (hereinafter "Tr. I") at 128–29.

Spectrum also manufactured new wire product, using the State Wire equipment which had been repossessed by the bank, and was later repurchased by Spectrum Wire. Tr. I at 133; Transcript of Hearing of May 3, 1989 ("Tr. II") at 99. Spectrum's repurchase of the equipment was financed by the bank. The debtor admitted that when Spectrum Wire repurchased the equipment from the bank, the debtor agreed to mortgage his house to the bank for $90,000 in exchange for the bank's agreement to excuse the debtor from personal liability for bank funds which had been borrowed to operate State Wire. Tr. I at 173; Tr. II at 106–11. Spectrum Wire paid the bank $475,000 to repurchase the equipment, although the debtor acknowledged that he had determined that the market value of the equipment was only $300,000. Tr. I at 184–85.

At its inception, Spectrum Wire rented the former State Wire headquarters in Westfield, Massachusetts which was owned by the debtor. Spectrum Wire's rent payments were sent directly to the bank and to the Fords, as monthly payments for the mortgages they held on the debtor's property. Tr. I at 164–65.

**3.** The debtor served as chief executive officer and later as president of Spectrum Wire. Tr. I at 136–37. Spectrum Wire provided him with a $40,000 BMW automobile for his personal use. Tr. I at 159.

As the new corporation's highest paid employee, the debtor was paid a salary at the annual rate of $75,000, which was raised to $100,000 per year by the end of 1986, the company's first year in business. When his corporate bonus was added to his salary, Gary MacDonald's total compensation from Spectrum Wire totaled $163,000 in 1986. Tr. I at 148. A survey of average salaries for chief executive officers *who held substantial stock* in companies of the size and type comparable to Spectrum Wire was $83,000. Transcript of Hearing of May 12, 1989 ("Tr. III") at 29–35 (emphasis added). The debtor was paid $80,405 by Spectrum Wire in 1987. *Id.* His salary during 1988 and 1989 was $100,-000 per year. Tr. III at 70.

tended as a loan to a corporation controlled by the debtor.[4] Additionally, there is evidence that the debtor has used his control of Spectrum Wire's resources to set up a new corporation which he owns outright.[5] To ignore the evidence presented to the bankruptcy court, and leave majority ownership of the Spectrum Wire stock with the debtor's father would result in injustice and injurious consequences to the debtor's other lenders and creditors. The record provides adequate support for the bankruptcy court's determination that the debtor is the beneficial owner of 90% of the Spectrum Wire stock.

### C. Spectrum Stock as Subject to 11 U.S.C. § 542(a) Turnover Provision

While state law determines the debtor's property interest in the Spectrum stock, "the extent to which a debtor's interest in property creates 'property of the estate' for turnover purposes is a question of fed-

eral law." *In re Bryn Athyn Investors, Ltd.,* 69 B.R. 452, 456 (Bankr.E.D.N.C. 1987), *citing United States v. Whiting Pools,* 462 U.S. 198, 203–09, 103 S.Ct. 2309, 2312–16, 76 L.Ed.2d 515 (1983); *In re Armstrong,* 56 B.R. 781, 785 (Bankr.W.D.Tenn. 1986).

Under federal bankruptcy law, any property of the debtor's estate which "the trustee may use, sell, or lease" pursuant to 11 U.S.C. § 363 must be turned over to the trustee by any entity "in possession, custody, or control" of such property. 11 U.S.C. § 542(a). As stated above, "property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).

As this Court has found, the record supports the bankruptcy court's conclusion that the debtor held an equitable interest in the Spectrum Wire stock. "Under Section

**4.** During a bankruptcy court hearing, the debtor's father acknowledged that he did not know in what proportion his $200,000 investment in Spectrum was divided between loans to the company and stock purchase. Tr. I at 67–69. The accountant who kept Spectrum's books testified that the debtor's father obtained a 90% share in the company on March 3, 1986 for a supposed capital contribution of $37,500, while the debtor's brother, Greg MacDonald, obtained a 10% interest in Spectrum on April 29, 1986 for a disproportionately larger contribution of $16,-250. Tr. II at 146–47, 219–20. While the debtor's father never had possession of his corporate stock certificates, Greg MacDonald testified that he had possession of his stock certificates. Tr. II at 158.

Earl MacDonald's $37,500 capital contribution was calculated by Spectrum Wire's accountant, who also handled the finances of the debtor, the debtor's father and other members of the MacDonald family. Earl MacDonald's personal checks, later designated by the accountant as covering all but $1,500 of the capital investment, were labelled as "loans," Tr. I at 131; Plaintiff/Appellee's Exhibit 2 (letter of William D. Corbin C.P.A.). When these personal checks were deposited in Spectrum Wire's bank account, the deposits were recorded in Spectrum Wire's check register as "Loan from Earl, Adele MacDonald." Tr. II at 113. At the time of Gary MacDonald's bankruptcy filing, of the $198,000 which Earl MacDonald loaned to Spectrum Wire, $162,500, plus interest at 13%, was repaid to him by Spectrum Wire. Tr. I at 140.

Spectrum Wire paid a $55,375 income tax liability incurred by Earl MacDonald when he

was required to report Spectrum Wire's earnings on his personal income tax return. Tr. II at 116, 130. The debtor's father stated that he had no knowledge of how this income tax payment was arranged. *Id.*

The debtor's father also acknowledged that he was paid $7,000 per year to perform odd jobs for Spectrum Wire. Tr. at 71.

**5.** In 1987, the debtor moved Spectrum Wire to a building in East Longmeadow, Massachusetts which is owned by Spectrum Wire.

The debtor admitted that he formed another corporation, ESPI, which he operated from his office in the Spectrum Wire building. The debtor spent half his working day on ESPI business, even though his salary from Spectrum Wire remained at $100,000 per year, and he was paid no salary by the ESPI entity. ESPI loaned over $100,000 to Spectrum Wire during 1988. Tr. III at 36–50.

In May 1989, the debtor resigned from Spectrum Wire to devote full efforts to ESPI. The debtor changed the name of ESPI to "Spectrum Electrical Products, Incorporated." The debtor conducts Spectrum Electrical's business from the Spectrum Wire building. Tr. III at 105. All the employees of Spectrum Electrical were formerly employed by Spectrum Wire at the East Longmeadow location.

Additionally, the debtor's father began performing the same odd jobs for Spectrum Electrical which he had performed for Spectrum Wire, and State Wire. Tr. III at 45.

Most significantly, Spectrum Electrical is paying rent to Spectrum Wire for use of the building in East Longmeadow. Tr. III at 107–09.

541(a), equitable title unquestionably constitutes property of the estate." *In re Carver*, 61 B.R. 824, 828 (Bankr.D.S.D. 1986). The scope of section 541(a)(1) is broad, includes tangible and intangible property, and allows the bankruptcy "trustee to regain possession of property in which the debtor had equitable as well as legal title." *Whiting Pools*, 462 U.S. at 204–05 n. 8, 103 S.Ct. at 2313 n. 8. Therefore, the stock was properly the subject of a turnover order pursuant to section 542(a).

### D. Debtor's Intent to Hinder, Delay or Defraud Creditors Within the Meaning of 11 U.S.C. § 727(a)(2)

Section 727(a)(2)(A) directs the bankruptcy court to grant the debtor a discharge, unless the debtor has transferred or concealed property of the bankruptcy estate within one year before filing, with the intent to hinder, delay or defraud a creditor or officer of the estate. In the instant case, the bankruptcy court refused to grant a discharge to the debtor. The court found that although the debtor disclosed his father's legal interest in the Spectrum Wire stock, the debtor concealed his beneficial interest in the shares, with the intent to hinder, delay or defraud his creditors. *In re MacDonald*, 101 B.R. at 844.

■ The fact that legal title was vested in the debtor's father more than one year before the debtor filed for bankruptcy does not exclude the Spectrum Wire stock from the debtor's estate. Under the doctrine of continuing concealment, "concealment of an interest in an asset that continues, with the requisite intent, into the year before bankruptcy ... is within reach of section 727(a)(2)(A)." *In re Olivier*, 819 F.2d 550, 555 (5th Cir.1987) (discharge unavailable to debtors who kept a secret beneficial interest in their home, which had been legally conveyed seven years before bankruptcy filing). The facts in the instant case are analogous to other cases which have found a continuing concealment. See *Matter of Kauffman*, 675 F.2d 127, 128 (7th Cir.1981) (finding a continuing concealment even though conveyance of debtor's house to his wife was recorded); *Matter of Vecchione*,

407 F.Supp. 609, 617–18 (E.D.N.Y.1976) (debtors' continued use of cars constituted an equitable benefit and continuing concealment, even though they had transferred legal title); *In re Penner*, 107 B.R. 171, 176 (Bankr.N.D.Ind.1989) (denying discharge to debtor who attempted to hide under the trappings of an employer-employee relationship by serving as "manager" of dairy farm, after transferring farm ownership to his wife); *In re Hodge, infra* (denying discharge to debtor who managed and derived beneficial interests from business assets which had been transferred to corporations controlled by his wife); *In re Garcia*, 88 B.R. 695 (Bankr.E.D.Pa.1988) (discharge precluded by debtor's intent to conceal numerous assets); *In re Howard*, 55 B.R. 580, 584 (Bankr.E.D.N.C.1985) (denying discharge to debtor who retained a beneficial interest by living in house and keeping possession and enjoyment of antiques); *In re Balch*, 25 B.R. 22 (Bankr.N.D.Tex.1982) (denying discharge to debtor acknowledged that creation of carpet retailing corporation with stock issued to his wife was to prevent creditors from reaching his assets).

This Court has required that clear and convincing evidence of wrongdoing by a debtor support a finding that debts are nondischargeable in bankruptcy proceedings. *In re King*, 96 B.R. 413, 416–18 (Bankr.D.Mass.1989) (creditor did not show clear and convincing evidence that debts were nondischargeable under 11 U.S.C. § 523(a)(2)(B)). The clear and convincing standard is also applicable to cases involving denial of discharge under section 727. See *In re Hodge*, 92 B.R. 919, 923 (Bankr.D.Kan.1988); 4 *Collier on Bankruptcy, supra*, ¶ 727.14[6] at 727–102 (requirement of clear and convincing evidence appropriate for objections to discharge under 11 U.S.C. § 727).

■ While the record contains much evidence to support a finding that the debtor intended to shelter assets from creditors, this Court is unable to conclude that there is clear and convincing evidence of concealment of the debtor's beneficial interest in the Spectrum Wire stock. "[C]oncealment

has been defined to include hiding or withdrawing property from observation, preventing the discovery of property or withholding knowledge of existence, ownership or location of property." *In re McIsaac*, 19 B.R. 391, 396 (Bankr.D.Mass.1982) (debtors failed to provide reasonable explanation for retaining partnership funds, apparently intending to conceal those funds and place them beyond the reach of creditors). The record does indicate that the debtor was not cooperative in providing information to the trustee, especially with regard to revealing the existence of the Spectrum Electric Products Corporation, which the debtor created largely through the resources of Spectrum Wire. However, the debtor's compensation and control regarding Spectrum Wire were revealed, as was his father's ownership of the stock, leaving the concealment requirement of section 727(a)(2)(A) in question. *Accord In re Espino*, 806 F.2d 1001, 1003 (11th Cir.1986) (although debtors were employed by corporation legally owned by their children, their benefits were not concealed); *In re Wolmer*, 57 B.R. 128, 132 (Bankr.N.D.Ill.1986) (no concealment under section 727(a)(2)(A) since transaction was revealed at first meeting of creditors and creditor had been informed of details of transaction three years before petition filed); *In re Herron*, 49 B.R. 32, 35 (Bankr.W.D.Ky.1985) (creditors had actual knowledge of transaction sixteen months prior to discharge); *In re Goodman*, 38 B.R. 876, 878 (Bankr.D.Ky. 1984) (sale of assets was publicly advertised and creditor who had made no effort to accelerate debt failed to prove debtor's actual intent to defraud). Therefore, this Court concludes that the debtor would be entitled to a discharge upon transfer to the trustee of the debtor's beneficial ownership in the Spectrum Wire stock as well as legal ownership evidenced by the stock certificates.

## IV. CONCLUSION

The appellants' motion for oral arguments is DENIED. The motions to designate additional items for the record on appeal by the trustee and by the appellants are GRANTED.

The decision of the bankruptcy court is AFFIRMED with regard to the order to turn over stock in Spectrum Wire held in the name of Earl MacDonald.

The decision of the bankruptcy court is REVERSED with regard to denial of discharge of the debtor, Gary J. MacDonald.

Accordingly, this case is REMANDED to the Bankruptcy Judge for proceedings not inconsistent with this opinion.

It is So Ordered.